# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,

Plaintiff and Respondent,

v.

JOSE LUIS VALENCIA,

Defendant and Appellant.

S250218

Fifth Appellate District
F072943

Kern County Superior Court
LF010246B

_____

THE PEOPLE,

Plaintiff and Respondent,

v.

EDGAR ISIDRO GARCIA,

Defendant and Appellant.

S250670

Fifth Appellate District
F073515

Kern County Superior Court
LF010246A

July 1, 2021

Justice Corrigan authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Liu, Cuéllar, Kruger, Groban, and Jenkins concurred.

_____

PEOPLE v. VALENCIA[*]

S250218

Opinion of the Court by Corrigan, J.

This case involves allegations of active gang participation (Pen. Code, § 186.22, subd. (a)) and gang enhancements (Pen. Code, § 186.22, subd. (b)) attached to other offenses. The charges require proof that a gang's members have engaged in "a pattern of criminal gang activity" (Pen. Code, § 186.22, subd. (f)), defined, in part, as the commission of two or more enumerated offenses (Pen. Code, § 186.22, subd. (e)). We hold that the commission of such crimes, also known as predicate offenses, must be proven by independently admissible evidence. Under the authority of *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), such proof may not be established solely by the testimony of an expert who has no personal knowledge of facts otherwise necessary to satisfy the prosecution's burden. The judgment of the Court of Appeal, reaching the same conclusion, is affirmed.

## I. BACKGROUND

Early on the morning of August 24, 2014, Jose B. and Alejandro P. sat on the tailgate of a truck at a carwash in the City of Arvin. Multiple shots were fired. One round struck Jose in the leg and others hit the truck tires. Coincidentally, an officer on patrol near the carwash happened to see a pickup driving slowly with its lights off, then saw seven to 10 muzzle

---

[*] Consolidated with *People v. Garcia* (S250670).

1

flashes coming from the front passenger window. Shining a light on the pickup, the officer saw defendant Jose Luis Valencia behind the wheel and defendant Edgar Isidro Garcia in the passenger seat. An hour-long vehicle chase ensued, during which Garcia threw something from the truck's window. The cylinder of a revolver was later recovered in that vicinity. Defendants were ultimately arrested, and gunshot residue was found on the front passenger door of the pickup.

Both defendants were charged with two counts of attempted murder, assault with a firearm, and active street gang participation.[1] Garcia was also charged with shooting from a vehicle.[2] Valencia was charged with evading an officer and knowingly allowing a passenger to shoot from the truck.[3] Gang and firearm enhancements were attached to the various charges.[4]

Arvin Police Officer Ryan Calderon testified as a gang expert. A nine-year department veteran, he had specialized in gang enforcement for five and a half years and had personally investigated about 200 crimes involving the Arvina 13 gang. Calderon testified about the gang, describing its monikers, graffiti, tattoos, colors, and territory, which included the

---

[1]    Penal Code sections 187, subdivision (a), 189, subdivision (a), 664, subdivision (a), 245, subdivision (a)(2), 186.22, subdivision (a).

[2]    Penal Code section 26100, subdivision (c).

[3]    Vehicle Code section 2800.2, subdivision (a); Penal Code section 26100, subdivision (b).

[4]    Penal Code sections 186.22, subdivision (b)(1), 12022.5, subdivision (a), 12022.53, subdivisions (c), (d), (e)(1), 12022.55, 12022.7, subdivision (a).

carwash. Arvina 13's primary felonious activities include shootings, assaults, burglaries, and drug sales.

In Officer Calderon's opinion, Valencia and Garcia were Arvina 13 gang members, based on their tattoos and police contacts. In response to a hypothetical question, Calderon testified that defendants' conduct benefitted Arvina 13 by creating community fear and gang notoriety. Calderon also related the facts of three predicate offenses committed by Arvina 13 gang members: a 2008 assault by Jose Arredondo, a 2010 assault by Adam Arellano, and a 2013 attempted robbery and assault by Orion Jimenez. Calderon's only knowledge of these offenses came from conversations with other officers and a review of police reports. Certified copies of court documents related to the convictions in each case were admitted into evidence, including the pleadings and court minute orders.

Defendants' first trial ended when the jury hung on almost all charges.[5] A second jury convicted defendants of the remaining allegations. Both men were sentenced to extended prison terms.[6] The Court of Appeal held that some of the expert's testimony about the predicate offenses constituted inadmissible hearsay. It reversed the active gang participation

---

[5] The jury convicted Valencia of evading an officer but deadlocked on the remaining charges as to both defendants.

[6] The court sentenced Garcia to two terms of 15 years to life on the two attempted murder counts, plus 25 years to life for firearm discharge causing great bodily injury, and 20 years for firearm discharge, consecutive, staying the remaining counts. Valencia received two life terms for attempted murder and the same terms of 25 years to life and 20 years for firearm discharge by a principal in a gang offense, with the remaining charges stayed.

and enhancement allegations, as well as Valencia's firearm enhancements attached to those allegations, and otherwise affirmed the judgments. (*People v. Valencia* (July 10, 2018, F072943) [nonpub. opn.]; *People v. Garcia* (July 10, 2018, F073515) [nonpub. opn.].)[7] We granted the Attorney General's petitions for review and consolidated these two cases for decision.[8]

## II. DISCUSSION

The Attorney General argues the gang expert's recitation of hearsay describing the circumstances of the three predicate offenses constituted background information about which the expert could properly testify. To resolve this issue, we examine the statutory scheme covering gang allegations, our decisions in *Sanchez* and *People v. Veamatahau* (2020) 9 Cal.5th 16 (*Veamatahau*), and Court of Appeal decisions that have previously addressed the question.

---

[7] The Court of Appeal remanded both matters to the trial court for retrial on the reversed allegations or, if the People elect not to retry them, for resentencing. The trial court was ordered to exercise its discretion whether to strike Garcia's firearm enhancements under newly enacted Senate Bill No. 620 (2017–2018 Reg. Sess.) (Stats. 2017, ch. 682, §§ 1–2), and Valencia was to be allowed to make a record of factors relevant at a future youth offender parole hearing (Pen. Code, §§ 3051, 4801, subd (c); see *People v. Franklin* (2016) 63 Cal.4th 261, 283–284).

[8] We initially granted the People's petitions for review in these cases and held them for *People v. Perez* (2020) 9 Cal.5th 1 (*Perez*), which concluded a defendant's failure to object did not forfeit a *Sanchez* claim in a case predating that decision. (See *id*. at pp. 7–14.) After the *Perez* decision, we consolidated these matters and sought briefing on the current predicate offense issue.

A.  *The STEP Act*

In 1988, the Legislature enacted the California Street Terrorism Enforcement and Prevention Act (STEP Act or Act; Pen. Code, § 186.20 et seq.) to eradicate "criminal activity by street gangs."  (*People v. Loeun* (1997) 17 Cal.4th 1, 4 (*Loeun*).) Underlying the STEP Act was the Legislature's finding that "California is in a state of crisis which has been caused by violent street gangs whose members threaten, terrorize, and commit a multitude of crimes against the peaceful citizens of their neighborhoods."  (Pen. Code, § 186.21, 2d par.)   The Legislature sought to balance the "constitutionally protected rights of freedom of expression and association" (*id.*, 1st par.) with the need to protect all Californians from the burden of fear, intimidation and physical harm caused by gang violence, which it found presents "a clear and present danger to public order and safety" (*id.*, 1st par.).  The Act was specifically structured to protect both free association and public safety.  (See *People v. Rodriguez* (2012) 55 Cal.4th 1125, 1133–1135 (lead opn. of Corrigan, J.) (*Rodriguez*).)

As relevant here, the STEP Act created a substantive offense of active participation "in any criminal street gang" (Pen. Code, § 186.22, subd. (a)), and a sentencing enhancement for a felony committed "for the benefit of, at the direction of, or in association with any criminal street gang" (Pen. Code, § 186.22, subd. (b)(1)).  (See *Rodriguez, supra,* 55 Cal.4th at p. 1130 (lead opn. of Corrigan, J.); see also *id.* at p. 1130, fn. 5 (lead opn. of Corrigan, J.).)   The Act defines such a gang as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more [enumerated offenses], having a common name or common identifying sign or symbol,

and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity." (Pen. Code, § 186.22, subd. (f).) A " 'pattern of criminal gang activity' " is separately defined as "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more [enumerated] offenses, provided at least one of these offenses occurred after the effective date of this [Act] and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons . . . ." (Pen. Code, § 186.22, subd. (e).)[9] The offenses comprising a pattern of criminal gang activity are referred to as predicate offenses. (See *Loeun, supra,* 17 Cal.4th at p. 4.) We use the term "commission" in this opinion to include the broader statutory inclusion of the "attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction" of a predicate offense. (Pen. Code, § 186.22, subd. (e).)

Penal Code section 186.22, subdivision (e) does not state that a predicate offense must be committed by a gang member. However, that requirement derives from the definition of a " 'criminal street gang,' " which includes proof that the gang's "*members* individually or collectively engage in, or have engaged

_____

[9] The original STEP Act was an urgency measure that went into effect on September 26, 1988. (Stats. 1988, ch. 1242, § 3; see *People v. Gardeley* (1996) 14 Cal.4th 605, 626 (*Gardeley*), disapproved on another ground in *Sanchez, supra,* 63 Cal.4th at p. 686, fn. 13.) Citations here are to the Act which became effective on January 1, 1993. (Stats. 1989, ch. 930, § 5.1.) Those provisions, by their terms, are repealed as of January 1, 2022, to be replaced by an identical provision on that date. (See Stats. 2016, ch. 887, § 1; Stats. 2017, ch. 561, § 179.)

in, a pattern of criminal gang activity." (Pen. Code, § 186.22, subd. (f), italics added.) It follows, then, that the proof of a predicate offense must establish that a member of a defendant's alleged gang was involved in its commission.[10] Taken together the statutory scheme requires proof that gang members committed at least two predicate offenses within the statutory timeframe. Such proof will generally require evidence of who committed the crime and when they did so, as well as evidence of their gang membership and the nature of the crimes. How those particular facts are proven lies at the heart of this case.

B. Sanchez *and* Veamatahau

In *Sanchez*, the defendant was arrested and found to possess a gun and drugs packaged for sale. (*Sanchez, supra,* 63 Cal.4th at p. 671.) He was convicted of drug and firearm offenses with attached gang enhancements (Pen. Code, § 186.22, subd. (b)(1)) and the substantive offense of active gang participation (Pen. Code, § 186.22, subd. (a)). (*Sanchez*, at pp. 671, fn. 1, 673.) On appeal, he argued that the gang expert was erroneously permitted to testify about five prior contacts Sanchez had with police. The expert had no personal knowledge

---

[10] The requirement that a gang member be involved in a predicate offense is to be distinguished from new allegations that the charged defendant actively participated in a gang (Pen. Code, § 186.22, subd. (a)) or committed a gang enhancement (Pen. Code, § 186.22, subd. (b)). A defendant need not be a gang *member* for those charged allegations to be proven, so long as all statutory elements are satisfied. (See *Rodriguez, supra,* 55 Cal.4th at p. 1130 (lead opn. of Corrigan, J.); *People v. Valdez* (2012) 55 Cal.4th 82, 132; Pen. Code, § 186.22, subd. (i).) However, before a conviction can be relied on in the future as evidence of a predicate offense, there must be evidence that the perpetrator was a gang member.

of these contacts but read about them in police reports and other sources. (*Id*. at p. 673.) The expert was permitted to testify as to the particulars of the police contacts, as described in those documents, to explain the basis of his opinion that Sanchez was a gang member and committed the charged offenses for the gang's benefit. (See *id*. at p. 683; *Gardeley, supra,* 14 Cal.4th at pp. 618–620.) If offered for the truth of their content, statements repeated from those sources would constitute hearsay. The jury was told, however, that the testimony was not admitted for its truth but only to explain the basis for the expert's opinion. (*Sanchez*, at p. 684.)

In *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), the United States Supreme Court held that the confrontation clause of the federal Constitution generally bars the admission of what it termed "testimonial" hearsay when offered by the prosecution against a criminal defendant without a showing of witness "unavailability and a prior opportunity for cross-examination." (*Crawford*, at p. 68.) It clarified, however, that out-of-court statements *not* offered for the truth of their content are not hearsay and do not impinge upon the confrontation right. (*Id*. at pp. 59–60, fn. 9.) *Sanchez* addressed "whether facts an expert relates as the basis for his opinion are properly considered to be admitted for their truth." (*Sanchez, supra,* 63 Cal.4th at p. 674.) *Sanchez* arose at the intersection of the hearsay rule, the holdings in *Crawford* and its progeny, and the evidentiary rules applicable to expert testimony.

Hearsay is an out-of-court statement offered to prove the truth of its content.[11] Ordinarily, hearsay is inadmissible unless it falls under a recognized exception. (Evid. Code, § 1200, subd. (b).) In addition, lay witnesses may only testify about matters within their personal knowledge. (Evid. Code, § 702, subd. (a).)[12] In the case of experts, both of these general rules are applied with greater latitude. "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) "An expert may express an opinion on 'a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' (Evid. Code, § 801, subd. (a.) In addition to matters within their own personal knowledge, experts may relate information acquired through their training and experience, even though that information may have been derived from conversations with others, lectures, study of learned treatises, etc." (*Sanchez, supra*, 63 Cal.4th at p. 675.) "[A]n expert's testimony concerning his general knowledge, even if technically hearsay, has not been subject to exclusion on hearsay grounds." (*Id.* at p. 676.)

---

[11] The statute defines hearsay as "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).)

[12] " 'Personal knowledge' means a present recollection of an impression derived from the exercise of the witness' own senses." (Cal. Law Revision Com. com., 29B pt. 2A West's Ann. Evid. Code (2019 ed.) foll. § 702, p. 416.) " 'Perceive' means to acquire knowledge through one's senses." (Evid. Code, § 170.)

*Sanchez* contrasted general knowledge about facts accepted in the expert's field with "*case-specific* facts about which the expert has no independent knowledge." (*Sanchez, supra,* 63 Cal.4th at p. 676.) "Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." (*Id.* at p. 676; see further discussion of what constitutes "case-specific facts" in pts. C & D, *post.*) "Generally, parties try to establish the facts on which their theory of the case depends by calling witnesses with personal knowledge of those case-specific facts. An expert may then testify about more generalized information, even if derived from hearsay, to help jurors understand the significance of those case-specific facts. An expert is also allowed to give an opinion about what those facts may mean. The expert is generally not permitted, however, to supply case-specific facts about which he has no personal knowledge."[13] (*Sanchez,* at p. 676.)

Exploration of an expert's opinion based on case-specific facts outside the expert's personal knowledge can still be accomplished through the use of hypothetical questions: "An examiner may ask an expert to assume a certain set of case-specific facts for which there is independent competent evidence, then ask the expert what conclusions the expert would draw

---

[13] Education and training often involve statements and writings conveyed by teachers and other experts. In addition, however, expert witnesses may acquire knowledge through their own experimentation, observations and personal experience. (See Evid. Code, § 720, subds. (a), (b); Simons, Cal. Evidence Manual (2021) § 4:1, pp. 318–321.) Like any other witness, experts can relate what they have personally observed and that testimony would not be hearsay. It can, of course be challenged by the opponent, but its admission would not implicate *Sanchez* or the broader hearsay rule.

from those assumed facts. If no competent evidence of a case-specific fact has been, or will be, admitted, the expert cannot be asked to assume it. The expert is permitted to give his opinion because the significance of certain facts may not be clear to a lay juror lacking the expert's specialized knowledge and experience." (*Id.* at pp. 676–677.)

Although "[a]t common law, the treatment of an expert's testimony as to general background information and case-specific hearsay differed significantly" (*Sanchez, supra,* 63 Cal.4th at p. 678), that treatment evolved after enactment of the Evidence Code in 1965: "Evidence Code section 801, subdivision (b) provides that an expert may render an opinion '[b]ased on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, *whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates*, unless an expert is precluded by law from using such matter as a basis for his opinion.' (Italics added.) Similarly, Evidence Code section 802 allows an expert to 'state on direct examination the reasons for his opinion and the matter (including, in the case of an expert, his special knowledge, skill, experience, training, and education) upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion.' " (*Sanchez*, at p. 678.) Where an expert relied upon out-of-court statements to explain the bases of an opinion, "[c]ourts [had] created a two-pronged approach to balancing 'an expert's need to consider extrajudicial matters, and a jury's need for information sufficient to evaluate an expert opinion' so as not to 'conflict with an accused's interest in avoiding substantive use of unreliable

hearsay.' " (*Id.* at p. 679, quoting *People v. Montiel* (1993) 5 Cal.4th 877, 919.) The jury would be given a limiting instruction that "matters admitted through an expert go only to the basis of his opinion and should not be considered for their truth." (*Montiel*, at p. 919.) The trial court retained discretion to exclude the evidence under Evidence Code section 352 if it concluded the probative value was substantially outweighed by the probability that the jury would ignore the limiting instruction and "improperly consider it as independent proof of the facts recited therein." (*People v. Coleman* (1985) 38 Cal.3d 69, 91.)

*Sanchez* disapproved the *Montiel* procedure. (*Sanchez, supra,* 63 Cal.4th at p. 686, fn. 13.) "When an expert relies on hearsay to provide case-specific facts, considers the statements as true, and relates them to the jury as a reliable basis for the expert's opinion, it cannot logically be asserted that the hearsay content is not offered for its truth. In such a case, 'the validity of [the expert's] opinion ultimately turn[s] on the truth' [citation] of the hearsay statement." (*Sanchez,* at pp. 682–683.) *Sanchez* observed that juries are instructed to decide " 'whether information on which the expert relied was true and accurate' " (*id.* at p. 684, quoting CALCRIM No. 332), and "[w]ithout independent competent proof of those case-specific facts, the jury simply ha[s] no basis from which to draw such a conclusion." (*Sanchez,* at p. 684.) "Once we recognize that the jury must consider expert basis testimony for its truth in order to evaluate the expert's opinion, hearsay and confrontation problems cannot be avoided by giving a limiting instruction that such testimony should not be considered for its truth. If an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are

necessarily considered by the jury for their truth, thus rendering them hearsay. Like any other hearsay evidence, it must be properly admitted through an applicable hearsay exception. Alternatively, the evidence can be admitted through an appropriate witness and the expert may assume its truth in a properly worded hypothetical question in the traditional manner." (*Id.* at p. 684, fn. omitted.)

*Sanchez* concluded the gang expert related case-specific facts.[14] "[His] case-specific testimony as to defendant's police contacts was relied on to prove defendant's intent to benefit the Delhi gang when committing the underlying crimes to which the gang enhancement was attached. [He also] recounted facts contained in the police reports and STEP notice to establish defendant's Delhi membership. While gang membership is not an element of the gang enhancement [citation], evidence of defendant's membership and commission of crimes in Delhi's territory bolstered the prosecution's theory that he acted with intent to benefit his gang, an element it was required to prove." (*Sanchez, supra,* 63 Cal.4th at pp. 698–699; see *id.* at p. 685.)

In *Veamatahau,* the defendant was charged with possessing contraband pills. The question at trial was whether

---

[14] An out-of-court statement about case-specific facts may or may not involve "testimonial hearsay," depending on who made the statements, under what circumstances, and for what purpose. (Cf. *Ohio v. Clark* (2015) 576 U.S. 237, 243–251; *Davis v. Washington* (2006) 547 U.S. 813, 821–832; *Crawford, supra,* 541 U.S. at pp. 51–59; *People v. Cage* (2007) 40 Cal.4th 965, 984; Simons, Cal. Evidence Manual (2020) § 2:115.) One import of the *Sanchez* holding, however, is that out-of-court statements offered to prove case-specific facts are hearsay regardless of any testimonial character. (See *Sanchez, supra,* 63 Cal.4th at pp. 684–686.)

the recovered pills contained the controlled substance alprazolam.  An expert compared markings he saw on the pills "against a database containing descriptions of pharmaceuticals."  (*Veamatahau, supra,* 9 Cal.5th at p. 22.) Asked about the identification process, the expert testified that the approach he employed was generally accepted in the scientific community.  He elaborated on cross-examination that "when 'there's a controlled substance in the tablet, the FDA [(Food and Drug Administration)] requires companies to have a distinct imprint on those tablets to differentiate it from any other tablets.  The FDA regulates that.  [¶] And if there's a tablet that has — in this case GG32 — or 249 [as an imprint] — you can look that up.  And it's going to tell you that it contains alprazolam, 2 milligrams.  And that's — we trust that, all those regulations being in place, to say that there's alprazolam in those tablets.' "  (*Id.* at p. 23.)  Based on this database search, the expert opined the pills contained alprazolam.  (*Ibid.*) *Veamatahau* concluded that the expert's testimony about what he read from the database was background information.  "[The expert's] statement concerning what the database 'tell[s] you' related general background information relied upon in the criminalist's field.  The facts disclosed by the database, and conveyed by [the expert], are 'about what [any generic] pills containing certain chemicals look like.'  [Citation.]  The database revealed nothing about 'the particular events . . . in the case being tried,' i.e., the particular pills that Sergeant Simmont seized from defendant.  [Citation.]  Any information about the specific pills seized from defendant came from [the expert's] personal observation (that they contained the logos 'GG32 — or 249') and his ultimate opinion (that they contained alprazolam), not from the database.  In short, information from the database

is not case specific but is the kind of background information experts have traditionally been able to rely on and relate to the jury." (*Id.* at p. 27.)

*Veamatahau* clarifies that the distinction between background information and case-specific facts can depend, in part, on what the evidence, considered independently, is offered to prove. The expert's testimony about the contents of the database, and expert reliance on it, was offered to prove that *all* pills with a given imprint contain alprazolam. That testimony, though hearsay, related background information. His opinion was offered to prove that the *defendant's pills,* those at issue in the current prosecution, contained alprazolam. The markings on the defendant's pills were case-specific facts. The expert was permitted to testify about them because his own observation of the markings provided personal knowledge. The jury was entitled to consider the expert-provided background information, even though hearsay, along with his personal observations and opinion to determine whether the pills the defendant possessed contained the controlled substance. (See discussion, *post*.)

### C. *Distinguishing Background Information from Case-specific Facts*

In gang cases, drawing the line of demarcation between background and case-specific information can present challenges, as reflected by the different conclusions drawn by the Courts of Appeal regarding predicate offenses. Several cases have held that predicate offense evidence is merely background similar to other kinds of information about gangs, like their territory, symbols, and operations, that are generally accepted as true by experts in the field. (See *People v. Bermudez* (2020) 45 Cal.App.5th 358, 363; *People v. Blessett* (2018) 22 Cal.App.5th

903, 944–945, disapproved on another ground in *Perez, supra,* 9 Cal.5th at p. 14; *People v. Vega-Robles* (2017) 9 Cal.App.5th 382, 410–411; *People v. Meraz* (2016) 6 Cal.App.5th 1162, 1174–1175.) Those cases pointed to language in *Sanchez* that describes case-specific facts as those "relating to the particular events and participants alleged to have been involved in the case being tried." (*Sanchez, supra,* 63 Cal.4th at p. 676.) They went on to conclude that testimony about predicate offenses merely conveyed "historical facts" about the gang's conduct and activities, as opposed to specific facts relating to the events and participants involved in the case being tried. (*Blessett*, at p. 944.) *Bermudez* opined that "so long as the predicate offenses do not involve defendant or individuals involved in the defendant's case[,] [s]uch predicate offenses are chapters in a gang's biography . . . not case-specific information." (*Bermudez*, at. p. 363.)

To determine whether predicate offenses are case-specific or background facts, we must look beyond an isolated phrase in *Sanchez* and instead probe the underlying rationale permitting experts to rely on and relate certain hearsay. As *Sanchez* observed, "expert witnesses are given greater latitude" to testify regarding background information beyond matters within their personal knowledge because their testimony may "provide specialized context the jury will need to resolve an issue." (*Sanchez, supra,* 63 Cal.4th at p. 675.) Thus, experts are given latitude over lay witnesses only to the extent they are conveying acquired expertise in their field. *Sanchez* explained that "[o]ur decision does not call into question the propriety of an expert's testimony concerning background information regarding his knowledge and expertise and *premises generally accepted in his field.* Indeed, an expert's background knowledge and experience

is what distinguishes him from a lay witness, and, as noted, testimony relating such background information has never been subject to exclusion as hearsay, even though offered for its truth. Thus, our decision does not affect the traditional latitude granted to experts to describe background information and knowledge in the area of his expertise, even when based on hearsay. Our conclusion restores the traditional distinction between an expert's testimony regarding background information and case-specific facts." (*Id.* at p. 685, italics added.)

*Sanchez* and *Veamatahau* make clear that experts are given greater latitude to testify about matter beyond their personal knowledge because they are allowed to give an opinion on subjects "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact" (Evid. Code, § 801, subd. (a)), so long as the opinion is based on matter "that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject" (Evid. Code, § 801, subd. (b)). "This latitude is a matter of practicality. A physician is not required to personally replicate all medical experiments dating back to the time of Galen in order to relate generally accepted medical knowledge that will assist the jury in deciding the case at hand. An expert's testimony as to information generally accepted in the expert's area, or supported by his own [personal] experience, may usually be admitted to provide specialized context the jury will need to resolve an issue." (*Sanchez, supra,* 63 Cal.4th at p. 675.) Hallmarks of background facts are that they are generally accepted by experts in their field of expertise, and that they will usually be applicable to all similar cases. Permitting experts to relate background hearsay information is analytically based on the safeguard of reliability. A level of

reliability is provided when an expert lays foundation as to facts grounded in his or her expertise and generally accepted in that field. In *Veamatahau,* for example, the hearsay database information was accepted by experts in the field as accurately stating that pills of a certain appearance contain alprazolam. (See *Veamatahau, supra,* 9 Cal.5th at p. 32.)

Conversely, if experts give testimony that goes beyond their own experience or beyond principles generally accepted in their field, the justifications for allowing greater evidentiary latitude cease to apply. One commentator has noted that the pre-*Sanchez* "not in for the truth" approach blurred the line between general background knowledge and case-specific fact. The previous approach "opened the door to abuse; namely, expert witnesses being used as conduits to transmit inadmissible hearsay that does not otherwise fall under a statutory exception as assertions of fact to the jury. With such a liberal approach to admissibility, there is a risk that damaging inadmissible evidence, which would be unable to make its way to the jury through the proper channels, could be smuggled to the jury through the expert; or worse, parties may offer expert testimony simply to place such damaging evidence before the fact-finder disguised as expert basis testimony. The *Sanchez* rule curbs this potential for abuse with its bright-line rule prohibiting an expert from relating all case-specific hearsay statements forming the basis of the expert's opinion, unless such hearsay statements fall under an applicable hearsay exception or are properly admitted independent of the expert's testimony." (Hamilton, *The End of Smuggling Hearsay: How* People v. Sanchez *Redefined the Scope of Expert Basis Testimony in California and Beyond* (2018) 21 Chap. L.Rev. 509, 511, fns. omitted.) In other words, case-specific facts are not purged of

their hearsay character just because an expert, rather than a lay witness, is asked to repeat them in court.

The challenge, then, in *Sanchez* and *Veamatahau* was to accommodate the longstanding rule allowing experts to testify about "information generally accepted in the expert's area" or matters "in his field of expertise" (*Sanchez, supra,* 63 Cal.4th at pp. 675, 676), yet restore the rule that experts may not simply "regurgitate information from another source" (*Veamatahau, supra,* 9 Cal.5th at p. 34). *Sanchez* and *Veamatahau* used the terms "general background information" and "case-specific facts" to distinguish, in the context of expert testimony, between hearsay that may be admitted because it is generally accepted by experts in the field, and facts that cannot be proven by hearsay because that reliability justification is absent.[15] These latter case-specific facts must be proven through the testimony of a witness with personal knowledge or by other admissible evidence. (See generally *Sanchez, supra,* 63 Cal.4th at p. 677.)

The proper role of expert testimony is to help the jury understand the significance of case-specific facts proven by competent evidence, not to place before the jury otherwise unsubstantiated assertions of fact. On the other hand, any

---

[15] In this sense, the phrase "general background information" from *Sanchez* (*Sanchez, supra,* 63 Cal.4th at p. 678) is tethered to the concept of information derived from hearsay but generally considered accurate in a field of expertise. As discussed *ante* (see p. 10, fn. 13), an expert's personal knowledge, on the other hand, may provide context relevant to assist jurors in understanding the facts of a given case (Evid. Code, § 801, subd. (a)), but it does not involve the recitation of hearsay. As used in *Sanchez* the term "general background information" refers to expert knowledge derived from hearsay that is generally accepted as accurate by experts in the field.

witness, whether lay or expert, may testify to facts within their personal knowledge, so long as those facts are relevant. The reliability of those facts is furnished not by general agreement among experts in their field, but by the witness's personal knowledge, for which there must be foundation. In addition, the accuracy of that testimony can be tested by cross-examination exploring the circumstances under which the witness's knowledge was acquired and whether it is being accurately remembered and recounted. A lay witness need not know the *significance* of the facts or how that significance might be explained by an expert, but the witness must have the required personal knowledge.

This conclusion mirrors the facts and analysis from *Veamatahau*. There, hearsay information from the database was properly admitted as background because it was generally accepted in the field that the FDA markings were reliable indications of the drug's presence and also that the database itself accurately connected the FDA marks with the presence of that drug. (Evid. Code, § 801, subd. (b).)[16] Based on those hearsay background facts and his own personal observations about the markings he saw, the expert formed an opinion to which he testified, and on which the jury was entitled to rely, if

---

[16] The initial burden is on the proponent to lay a foundation of general acceptance. (Cf. *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 769–773.) The opposing party is, of course, entitled to challenge the foundation by cross-examination or the introduction of contrary evidence. The challenge may be brought in limine, renewed through a motion to strike, or attacked as unreliable in argument to the jury.

they found it to be credible.  (See *Veamatahau, supra*, 9 Cal.5th at pp. 26–35.)

### D.  *Predicate Offenses Are Case-specific and Must Be Proven by Competent Evidence*

The Attorney General argues that facts used to prove predicate offenses are merely background information properly supplied by expert testimony.  This argument fails because of the nature of the facts themselves, the absence of foundation that they are generally accepted as reliable in a field of expertise, and the allegations they are being offered to prove.  As *Sanchez* observed, general testimony about a gang's behavior, history, territory, and general operations is usually admissible.  (See *Sanchez, supra,* 63 Cal.4th at p. 698.)  The same is true of the gang's name, symbols, and colors.  All this background information can be admitted through an expert's testimony, even if hearsay, if there is evidence that it is considered reliable and accurate by experts on the gang.

Such information stands in contrast to information regarding the commission of a particular offense on a specific occasion.  Experts with no personal knowledge of case-specific facts, or who do not rely on other admissible evidence establishing those facts, are simply "regurgitat[ing] information from another source."  (*Veamatahau, supra,* 9 Cal.5th at p. 34.)  This is the practice rejected in *Veamatahau* and warned against in *Sanchez*.  "What an expert *cannot* do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception."  (*Sanchez, supra,* 63 Cal.4th at p. 686; see *Veamatahau,* at pp. 33–34.)  Without independent admissible evidence of the particulars of the predicate offenses, the expert's hearsay testimony cannot be used to supply them.  In the

absence of any additional foundation, the facts of an individual case are not the kind of general information on which experts can be said to agree.

The Attorney General relies on the *Sanchez* description of case-specific facts as those relating to "the particular events and participants alleged to have been involved in the case being tried." (*Sanchez, supra,* 63 Cal.4th at p. 676.) We acknowledge that the statutorily required predicate offenses do not fit neatly into the description *Sanchez* provided. At least some of these offenses will most often have occurred before "the case being tried" (*ibid.*) and will have been committed by others who were not involved in the new charges at issue. But *Sanchez* was addressing case-specific facts as they arose in the particular matter at hand; it did not address the question we face here. For reasons already explained, we conclude that facts concerning particular events and participants alleged to have been involved in predicate offenses, too, constitute case-specific facts that must be proved by independently admissible evidence.

It should be recalled that the STEP Act sought a balance between free association and protecting against the "clear and present danger" posed by this defined kind of organized criminal activity. (Pen. Code, § 186.21.) The statutory requirement that predicate offenses be separately proven serves to maintain that balance. Our interpretation here, requiring that this proof rest on competent evidence, also furthers that legislative intent. In this respect, the proof of predicate offenses is similar to other kinds of case-specific facts that may have occurred before the commission of the charged offenses. These kinds of facts include evidence of motive, prior offense evidence admissible under Evidence Code section 1101, subdivision (b), and prior convictions suffered by the defendant on trial. It has long been

recognized that these kinds of facts alleged in the current trial must be proven by competent evidence.

In sum, the particular facts offered to prove predicate offenses as required by the STEP Act are not the sort of background hearsay information about which an expert may testify. Competent evidence of those particulars is required.[17] A gang expert may still render an opinion regarding the gang membership of the perpetrator of a predicate offense in response to a proper hypothetical question based on premises established by competent evidence. (See *Sanchez, supra,* 63 Cal.4th at pp. 676–677.)

E. *The Error Was Prejudicial*

Here, Officer Calderon testified regarding the facts of three predicate offenses of which he had no personal knowledge. No independent proof of those facts was tendered by any witness having personal knowledge. The People do not claim that any hearsay exception would support their admission. We need not address what exceptions might apply or what foundations would be required to invoke them. On this record, Calderon's recitation of hearsay was inadmissible.

As to the standard for evaluating prejudice, *Sanchez* observed that "improper admission of hearsay may constitute state law statutory error" (*Sanchez, supra,* 63 Cal.4th at p. 698), which would ordinarily be assessed under *People v. Watson*

---

**17** We disapprove the following cases, which reached a contrary conclusion: *People v. Bermudez, supra,* 45 Cal.App.5th at page 363; *People v. Meraz* (2018) 30 Cal.App.5th 768, 781–782; *People v. Blessett, supra,* 22 Cal.App.5th at pages 944–945; *People v. Vega-Robles, supra,* 9 Cal.App.5th at pages 410–411; *People v. Meraz, supra,* 6 Cal.App.5th at pages 1174–1175.

(1956) 46 Cal.2d 818. That test inquires whether "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Id.* at p. 836.) However, if the improperly admitted hearsay is also testimonial within the meaning of the high court's confrontation clause jurisprudence (see, e.g., *Crawford, supra,* 541 U.S. at pp. 68–69), the error is assessed under the federal constitutional standard of *Chapman v. California* (1967) 386 U.S. 18, 24, which requires any error to be harmless beyond a reasonable doubt. (See *Sanchez*, at p. 698.) The Attorney General concedes that, on this record, the *Chapman* standard applies here. As *Sanchez* notes, some of the contents of police reports may be testimonial hearsay. (See *Sanchez*, at pp. 694–695.)

The People argue any error was harmless beyond a reasonable doubt because the gang membership of those committing the predicate offenses was "supplied by admissible expert testimony." The People primarily point to the sequence of Officer Calderon's testimony, where he first described Arvina 13's primary activities before giving detailed factual recitations of the three predicate offenses. They argue Calderon could have properly opined that the predicate offenses were committed by gang members to benefit Arvina 13.

This argument is flawed. The People concede that, in giving his opinion, Calderon related to the jury facts he gleaned from inadmissible hearsay sources, including police reports, about which he had no personal knowledge.[18] Calderon

---

[18] Moreover, the Attorney General concedes that numerous hearsay statements from police reports and field identification

considered this information as true and related it to the jury as a reliable basis for his opinion. The jury was permitted to improperly rely on that hearsay to conclude the predicate offenses had been proven and that Valencia and Garcia acted with intent to benefit the gang when they committed the crimes with which they were charged. Based on the extent of the evidence and the elements it was offered to prove, we cannot conclude that the error was harmless under the *Chapman* standard.[19]

## III. DISPOSITION

The judgment of the Court of Appeal is affirmed.

**CORRIGAN, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**

---

cards were also improperly conveyed to bolster Calderon's opinion with respect to defendants' own gang membership.

[19] The People did not argue here or in the Court of Appeal that the circumstances of the charged offenses could constitute the necessary proof of predicate offenses. (See *People v. Zermeno* (1999) 21 Cal.4th 927, 930–933; *Loeun, supra,* 17 Cal.4th at pp. 9–13.) We did not grant review to address such an assertion and express no view on that question.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Valencia and People v. Garcia

---

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)** XX NP opns. filed 7/10/18 – 5th Dist.
**Rehearing Granted**

---

**Opinion No.** S250218 and S250670
**Date Filed:** July 1, 2021

---

**Court:**  Superior
**County:**  Kern
**Judge:**  Gary T. Friedman

---

**Counsel:**

Elizabeth J. Smutz, under appointment by the Supreme Court, Michael B. McPartland, under appointment by the Court of Appeal, for Defendant and Appellant Edgar Isidro Garcia.

Hilda Scheib, under appointment by the Supreme Court, for Defendant and Appellant Jose Luis Valencia.

Mary K. McComb, State Public Defender, Hassan Gorguinpour, Deputy State Public Defender, for Office of the State Public Defender as Amicus Curiae on behalf of Defendants and Appellants.

Kamala D. Harris and Xavier Becerra, Attorneys General, Matthew Rodriquez, Acting Attorney General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, Kathleen A. McKenna, Rebecca Whitfield, Daniel B. Bernstein, Rachelle A. Newcomb and Darren K. Indermill, Deputy Attorneys General, for Plaintiff and Respondent in No. S250670.

Xavier Becerra, Attorney General, Matthew Rodriquez, Acting Attorney General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Daniel B. Bernstein, Rachelle A. Newcomb, Amanda D. Cary, Lewis A. Martinez and Darren K. Indermill, Deputy Attorneys General, for Plaintiff and Respondent in No. S250218.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Darren K. Indermill
Deputy Attorney General
1300 I St.
Sacramento, CA 95814
(916) 210-7689

Hilda Scheib
P.O. Box 29098
San Francisco, CA 94129
(415) 750-9397

Elizabeth J. Smutz
Central California Appellate Program
2150 River Plaza Dr., Suite 300
Sacramento, CA 95833
(916) 441-3792

Hassan Gorguinpour
Deputy State Public Defender
770 L St., Suite 1000
Sacramento, CA 95814-3362
(916) 322-2676