Filed 8/23/22  P. v. Perez CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B314137 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA072383) |
| v. | |
| JORGE PEREZ | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kathleen Blanchard, Judge.  Affirmed in part and reversed in part.

Leslie Conrad, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Michael R. Johnsen and Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

————————————————

Jurors convicted defendant Jorge Perez and his confederate Jovanny Gonzalez of the murder of Armando Reyes and the attempted murder of Reyes's girlfriend S.B. S.B. drove Reyes to the scene of the shooting, and Perez drove Gonzalez. Gonzalez shot Reyes as he stepped out of S.B.'s car. Perez and Gonzalez were upset with Reyes because Reyes had insulted their gang. In a prior appeal we reversed Perez's conviction for the attempted murder of S.B. and remanded for resentencing. The People elected not to retry defendant on the attempted murder charge, and the trial court resentenced him on convictions for murder and shooting at an occupied vehicle. For both counts, the new sentence included gang and gang-related firearm enhancements.

After defendant's resentencing, the Legislature amended the law concerning the gang and gang-related firearm enhancements. On appeal, defendant argues that because his conviction is not yet final, he is entitled to the ameliorative changes in the law. The People agree that remand is necessary for a new trial on the enhancements. We vacate the gang and gang-related firearm enhancements. In all other respects, we affirm the judgment of conviction. Upon remand, the People may retry the gang and gang-related firearm enhancements under the new statutory requirements.

## FACTUAL BACKGROUND[1]

Reyes was a high-ranking member of the Palmas 13 Kings gang, an Antelope Valley gang. Omar Olivares also was a Palmas 13 gang member. Reyes and Olivares often used

---

[1] We previously described the underlying facts (*People v. Gonzalez et al.* (Apr. 10, 2020, B296206) [nonpub. opn.]) and repeat that factual description here.

2

methamphetamine together.  In June 2017, S.B. was Reyes's girlfriend.

Gonzalez and Perez were members of the Midtown Criminals, also known as MTC, another gang in the Antelope Valley.  Perez's moniker was Squeeks (also spelled Squeaks).

### 1.    *June 3, 2017*

S.B. drove Reyes to pick up Perez.  Reyes wanted Perez, a tattoo artist, to tattoo him.  Olivares was in the backseat of S.B.'s car.  After they picked up Perez, S.B. did not see Perez from the driver seat because Reyes was aggressive with her when she tried to look at Perez.

Before they reached a location where Perez could tattoo Reyes, Reyes and Olivares argued.  The argument concerned whether Olivares stole Reyes's stash of methamphetamine. Reyes told S.B. to stop the car to drop off Olivares.  S.B. refused until the group reached a gas station in Rosamond, where she stopped the car.  Reyes told Olivares to exit the car.  Olivares exited, and Perez followed even though Reyes had not told Perez to leave the car.  Perez was "irritated" that Reyes left him and Olivares at the gas station.

### 2.    *Reyes and Perez's June 4, 2017 Facebook messages*

On June 4, 2017, Reyes and Perez had the following colloquy on Facebook:[2]

Reyes:  "I need my money or tatt or I can make things really bad."

_____

[2] By quoting these messages, we do not condone the vulgar and derogatory language in the messages.

Perez: "After u doped me off in Rosamond? . . . now u wanna treated me?"

Reyes: "I do what I want when I want."

Perez: "Not around my parts."

Reyes: ". . . Foo I'm a dangerous azz enemie to have."

The colloquy continued:

Perez: "Look foo u can miss me with the fake politics bullshit . . . I ain't with that shit . . . wanna treated me with the light? . . . . go ahead I dare u."

Reyes: "Fuck u then and mantecas ol turn down ass foos that's why u got dissed and didn't do shit."

Reyes repeated, "Fuck mantecas" and Perez wrote, "Fuckin p.c." Perez testified mantecas meant lard. Eventually Reyes said, "Fuck ur dead homies." Perez testified that Reyes's comment "[f]uck your dead homies" was an insult.

During their conversation, Perez told Reyes, "Come over and stop wolfing." Perez testified that meant "[s]top messaging me talking shit." Perez told Reyes, "U ain't bout shit but running ur mouth," and instructed him, "COME OVER BITCH."

Then the following colloquy occurred:

Perez: "I fuckin dare u."

Reyes: "U ain't bout that."

Peres: "Come and see."

Reyes: "I woulda smoked u."

Perez told Reyes, "Don't be a lame," and Reyes said, "Like I said fuckkkkk mtc" and repeated multiple times "Fuck mtc." Reyes also repeated the insult "fuck ur dead homies."

Perez showed his conversation with Reyes to Perez's fellow MTC gang members with monikers Menace and Blue. All three were upset about Reyes's insults. Later Perez showed the

4

messages to "Mousey," another MTC member who wanted to fight Reyes because of the messages. Perez asked Reyes his location so that Mousey could fight Reyes. Perez testified that he sent the Facebook messages to Reyes because he did not want to appear weak in front of his gang members.

Reyes's last message to Perez said, "I'm pulling up." The only reference in the texts to S.B., was Perez's comment, "Tell ur fat ugly bitch . . . I said thanks for the ride."

### 3.    *June 4, 2017 shooting of Reyes*

Reyes went to a tattoo shop and obtained his tattoo from someone other than Perez. Reyes also smoked methamphetamine. S.B. and Reyes went to Reyes's brother's house, where they drank several drinks. S.B. overheard Reyes tell his brother that he would handle something one-on-one. S.B. did not know what Reyes intended to handle one-on-one. Shortly afterwards Gonzalez shot Reyes.

### 4.    *S.B.'s description of the shooting*

As S.B. was driving Reyes home, Reyes spotted a white Honda. The car was stopped in the middle of the street. S.B. and Reyes approached the stopped car, and the driver sped off. The white Honda had a dealer license plate.

Reyes told S.B. to follow the white car. S.B. did not want to follow the white Honda, but Reyes insisted that she follow it. S.B. made a U-turn and followed the white car. The white Honda stopped. As S.B. pulled up alongside the white Honda, Reyes exchanged words with its occupants. Reyes was positioned closer to the white Honda than S.B.

Reyes announced his gang name. Someone in the white Honda said MTC. Reyes put one foot out of the car, and it looked

5

like he was getting out.  Then he exited S.B.'s car and said he wanted to fight.  Then S.B. heard gunshots.[3]  The gunshots occurred seconds after Reyes exited S.B.'s car.  No gunshot hit S.B.

Either Perez or Gonzalez said, "[T]hat's what you get." Reyes jumped into the car and told S.B. to get down and drive away.  Reyes said, "Go, leave," after the gunshots.  S.B. drove to the next street where Reyes stopped breathing.  S.B. planned to take Reyes to the hospital "but then he stopped breathing" and she "knew [she] couldn't make it."  People helped Reyes out of the car and a nurse in the neighborhood tried to revive him, but according to S.B., "[H]e was already gone."

S.B. asked someone to call 911.  In the 911 call, S.B. described "guys pulled up to the car, and they just started shooting him."  She indicated that the shooter was in a white Honda Accord.  S.B. stated that Reyes was no longer breathing. When the paramedics arrived, they could not help Reyes.

Later, S.B. observed bullet holes in her car.  S.B.'s car sustained a bullet to the front passenger door jam, below the locking mechanism.  A bullet traveled from inside out through S.B.'s windshield near the driver seat.

When interviewed after the shooting, S.B. said that Reyes exited her car; S.B. heard five to seven shots; then Reyes "fell back into her vehicle."  The prosecutor clarified that S.B. said Reyes fell into the car after S.B. heard five to seven gunshots.

Based on photographic evidence, Deputy Sheriff Steven Blagg testified that a bullet struck the door jam in S.B.'s vehicle.

---

[3] S.B. also testified she did not hear the gunshots but only felt them.  She testified, "It just felt like wind.  Like quick wind going past my face."

A bullet also hit the left-lower corner of the windshield. The bullet traveled from inside the vehicle through the windshield. Bragg testified that the trajectory of the bullet was consistent with S.B.'s testimony that she felt a bullet "whiz from behind her."

**5.    *Gonzalez's statement to an informant***

Prior to trial, Gonzalez spoke with an informant and his recorded statements were played for jurors. Gonzalez said that police were questioning him on murder and probably found his .380 (a type of handgun). Later he said he did not know if police found the .380. Gonzalez said he was from Midtown Criminals and his moniker was Magic. Gonzalez said that he owned a 2017 Honda Accord. Gonzalez said that Squeeks (Perez) had been "busted already."

Gonzalez said he and Squeeks "gonna go down." Gonzalez acknowledged "we smoked him." Gonzalez indicated he was the shooter. Gonzalez said, "[T]hey fucked with the wrong person."

Gonzalez said, "[M]e and him knew this was gonna happen. But the thing is that the—the—they have to have—what do they have, homie? Fool, this case was cold. Cold."

Gonzalez was uncertain whether officers "found the .380." Gonzalez explained he "didn't get rid of it. [He] gave it to [his] homie. 'Cause it was [his] homie's."

Gonzalez said there was only one witness—"a girl, but she was on dope." Gonzalez said that the girl did not know his name. The informant said, "You should have got rid of her, homie." Gonzalez responded, "No, I couldn't at the time. The bullets were empty." Gonzalez repeated, "[T]he burner was empty." The agent replied, "Seriously? Was she there, though? Fuck." Gonzalez responded, "I had glasses on and a hat." Gonzalez

7

stated, "[I]f anything, they would have got him because he's the only link. The only link I have to this case is him." Gonzalez did not specifically identify his link.

Gonzalez explained that he disguised his car as he "didn't even have no license plate on it." After the shooting he had the windows tinted. He also washed the car three times.

In an apparent reference to the text messages, Gonzalez indicated that someone "had dissed my dead homie." Then Gonzalez said, "Hey, let me borrow the burner." "I hop out the backseat. Hop the backseat, put—put—put six in that nigga, and he died."[4] Gonzalez said he got out of the car and "[l]it him up." Gonzalez explained, "I was in the backseat. I was gonna hop out the back because I had—I had the burner in—in my daughter's . . . car seat." Gonzalez repeated that he was wearing a hat and "[s]he'd never seen me before, and she was on dope."

### 6. *Perez and his sister present alibi evidence*

In his defense, both Perez and his sister testified that Perez was babysitting for his sister's children at the time Reyes was killed. Perez did not reveal that he was babysitting when Deputy Sheriff Blagg first questioned Perez about the killing.

### 7. *Gang evidence and instructions*

Gang detective Giovanni Lamignano testified for the prosecution. He testified the primary activities of the MTC gang included vandalism, graffiti, assaults, assaults with deadly weapons, attempted murder, murder, and robbery. Perez committed second degree robberies in 2010 and 2012.

---

[4] As previously noted, we do not condone such derogatory language.

Detective Lamignano testified that MTC had over 100 members. Detective Lamignano opined that defendant was a member of MTC.

## PROCEDURAL BACKGROUND

The amended information contained counts 1, 2, 3, 5, 7, 8, and 9. In count 1, the People charged both defendants with the murder of Reyes. In count 2, the People charged the defendants with the attempted premediated murder of S.B. The People further charged defendants with shooting at an occupied vehicle. Firearm and gang enhancements were alleged with respect to all the above offenses. The People alleged one prior strike offense against Perez. The People further alleged that Perez suffered one prior offense within the meaning of Penal Code[5] section 667.5.

The trial court instructed the jury on the meaning of criminal street gang and primary activities under the old law. The court instructed the jury that it could consider the charged crimes in determining the primary activities of the gang and that it could consider crimes occurring after September 26, 1988. With respect to the firearm enhancement, the court instructed the jury that it had to determine whether Gonzalez personally used a firearm and whether a principal intentionally discharged a firearm and caused great bodily injury or death to a person other than an accomplice.

The jury found Perez guilty of murder and found true the gang and firearm enhancements within the meaning of section 12022.53, subdivisions (d) and (e)(1). The jury further found Perez guilty of the attempted murder of S.B. and the gang

---

[5] Undesignated statutory citations are to the Penal Code.

enhancement to be true. In contrast, the jury found not true the allegation that the attempted murder was committed willfully and with premeditation and deliberation. Finally, the jury convicted Perez of shooting at an occupied vehicle and found true the gang and firearm enhancements within the meaning of section 12022.53, subdivisions (d) and (e)(1).

Perez admitted that he suffered two prior convictions for robbery and that they constituted prior strike convictions. He also admitted that one fell within the ambit of section 667.5, subdivision (a) and subdivision (b).

The trial court initially sentenced Perez to an indeterminate term of 100 years to life and a 19-year determinate term. As noted, this court reversed in part and remanded for resentencing. Upon resentencing, the trial court sentenced Perez to an aggregate term of 80 years to life on count 1 (murder). The count-1 sentence included 25 years to life for the section 186.22, subdivision (b) gang enhancement and the section 12022.53, subdivision (d) and (e) firearm enhancement. The court sentenced defendant to a 14-year term on count 9 (shooting at an inhabited vehicle) and added 25 years to life pursuant to section 186.22, subdivision (b) and 12022.53, subdivisions (d) and (e). The court stayed the sentence on count 9 pursuant to section 654.

## DISCUSSION

For the following reasons, we agree with the parties that we must remand the case for retrial of the gang enhancement and the related firearm enhancement.

"Section 186.22 provides for enhanced punishment when a defendant is convicted of an enumerated felony committed 'for the benefit of, at the direction of, or in association with a criminal

street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members.' [Citation.]" (*People v. Delgado* (2022) 74 Cal.App.5th 1067, 1085 (*Delgado*); § 186.22, subd. (b)(1).) At the time of defendant's trial, the prosecution could establish a gang enhancement by showing that the alleged gang had engaged in a "pattern of criminal gang activity," which, at the time of trial, was defined as "commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more [enumerated] offenses, provided at least one of these offenses occurred after the effective date of this [Act] and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons . . . ." (Former § 186.22, subd. (e).) "The offenses comprising a pattern of criminal gang activity are referred to as predicate offenses." (*People v. Valencia* (2021) 11 Cal.5th 818, 829.)

Effective January 2022, the Legislature enacted Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 699, § 3) (Assembly Bill 333), which "impose[d] new substantive and procedural requirements for gang allegations." (*People v. Sek* (2022) 74 Cal.App.5th 657, 665 (*Sek*).) Assembly Bill 333 amended the definition of "pattern of criminal gang activity" provided in section 186.22, subdivision (e), and modified the requisite proof of predicate offenses, including that the currently charged offense may not be used to establish such a pattern. (§ 186.22, subd. (e)(1), (2).) In addition, newly-added subdivision (g) of section 186.22 provides that the language to "benefit, promote, further, or assist" a criminal street gang "means to provide a common benefit" to members that is likewise "more than reputational." (See § 186.22, subd. (g).)

11

The firearm enhancement under section 12022.53, subdivision (d) applies only to the person who personally and intentionally discharged a firearm. Subdivision (e)(1) makes the firearm enhancement applicable to any principal who violated section 186.22, subdivision (b), i.e., the gang enhancement. (*People v. Lopez* (2021) 73 Cal.App.5th 327, 347 (*Lopez*).) Where the firearm enhancement is dependent on the finding that the principal was "'convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members' as set forth in section 186.22, subdivision (b) (see § 12022.53, subd. (e)(1)(A)), the changes to section 186.22 made by Assembly Bill 333 require that the true findings on these enhancements, too, be vacated and the matter remanded to the trial court." (*Lopez*, at pp. 347–348.)

Turning to this case, as the parties agree, the new requirement that the benefit to the gang be more than reputational applies retroactively to nonfinal cases. (See *Delgado*, *supra*, 74 Cal.App.5th at p. 1087; *Lopez*, *supra*, 73 Cal.App.5th at pp. 343–344; *Sek*, *supra*, 74 Cal.App.5th at pp. 666–667.) Here, the prosecution did not present evidence that the benefit to the gang was more than reputational. (See § 186.22, subd. (g).) Because the People did not prove the gang enhancement under the requirements of the new law, both the gang enhancement and the section 12022.53, subdivision (e) firearm enhancement, which depends on proof of the gang enhancement, must be vacated.[6]

---

[6] Because we reverse the gang and firearm enhancements we need not decide whether Assembly Bill 333's other amendments to section 186.22 apply retroactively. Assembly

We remand the case to the trial court to provide the People an opportunity to meet Assembly Bill 333's new requirements. (*Sek, supra,* 74 Cal.App.5th at p. 669.)

## DISPOSITION

On both counts 1 (murder) and 9 (shooting at an occupied vehicle), the Penal Code section 186.22 and section 12022.53, subdivision (d) and (e)(1) enhancements are vacated. In all other respects the judgment is affirmed. On remand, the People may elect to retry defendant on the gang and related firearm enhancements.

NOT TO BE PUBLISHED.

BENDIX, J.

We concur:

ROTHSCHILD, P. J.          KELLEY, J.*

---

Bill 333 also added section 1109, which requires, at a defendant's request, the trial court bifurcate the gang participation charges and enhancements from other counts that do not otherwise require gang evidence as an element of the crime. Section 1109 is not at issue in the current appeal, and we express no opinion as to its retroactivity.

\* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.