Filed 8/6/21  P. v. Larry CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>VINCENT DARNELL LARRY,<br><br>Defendant and Appellant. | B297534<br><br>(Los Angeles County Super. Ct. No. TA143584) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kelvin D. Filer, Judge.  Modified and affirmed with directions.

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Michael R. Johnsen, Supervising Deputy Attorney General, and Blythe J. Leszkay, Deputy Attorney General, for Plaintiff and Respondent.

Appellant Vincent Darnell Larry was sentenced to two consecutive terms of life imprisonment without the possibility of parole after committing a double murder for the benefit of a criminal street gang, using a firearm.  (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(22), 12022.53.)[1]  The jury also convicted him of possession of a firearm by a felon.  (§ 29800, subd. (a)(1).)

We conclude that there is no proof of jury bias and no instructional error.  Appellant's Sixth Amendment rights were not violated.  Using records created by a court employee, the prosecution showed two predicate gang criminal offenses, without eliciting hearsay.  (Pen. Code, § 186.22; Evid. Code, §§ 452.5, 1280.)  With modifications to the abstract of judgment, we affirm.

## FACTS

Herbert Torres and Luis Velasco were killed in Los Angeles on April 29, 2017.[2]  Velasco sustained six bullet wounds; Torres was shot twice.  Torres was found by his neighbor, Mr. Ramos, in an alley adjoining their apartment complex.  Velasco's body was nearby, in the driver's seat of a BMW.  Ramos heard gunshots outside of his apartment around 3:00 that morning.

Ramos saw the victims the evening before the shooting.  Velasco was driving erratically in a BMW belonging to a girl named Nelly.  Velasco was known to drink, use drugs, and cause trouble in the neighborhood.

Ramos knows his apartment is in territory claimed by the East Coast Crips (ECC) street gang and has seen ECC graffiti on walls.  He was concerned about coming to court to testify.

---

[1] Undesignated statutory references are to the Penal Code.

[2] Unlabeled dates refer to the year 2017.

Security camera footage shows a confrontation in the alley at 1:00 a.m. on April 29. Appellant and a senior member of ECC, "Big Murk," face off with Torres. Appellant removes his jacket and is wearing a grey shirt. Big Murk intervenes; he and appellant walk away, looking upset. Two hours later, a vehicle drives down the alley. Torres is seated at the bottom of a stairwell. A person appears, fires a gun at Torres, walks to the BMW, runs back to Torres, then flees.

Detective McCoy investigated the shooting. He collected eight bullet casings and two live rounds near the stairwell and BMW where the victims were found. There was no indication of drug sales on either victim.

Witness Sanchez was friends with Torres since 2000. Sanchez has lived in the neighborhood for years and knows it is gang territory. Torres had gang tattoos on his arm and face. Sanchez was friendly with Velasco as well.

On the night of April 28, Sanchez was outside his apartment when appellant, known to Sanchez as "Newport," rode up on a bicycle. Appellant paused briefly and the two men said, "What's up?" Sanchez regularly saw appellant in the area.

Sanchez saw Torres and Velasco arrive at the apartment building and went to greet them. Torres was near stairs to the building and Velasco was near a BMW, acting drunk. They listened to music, then Sanchez returned to his apartment. After midnight, he and his wife heard gunshots.

At trial, Sanchez denied sensing hostility from appellant on the evening of April 28. However, he told police soon after the shootings that appellant approached aggressively and said, "What's up, paisa?" Sanchez thought this was "suspect." When police showed Sanchez security camera images, he identified

3

"Newport," who was wearing the same plaid jacket he had on when they exchanged greetings.

In a recorded police interview, Sanchez was shown a photograph in which he identified himself and appellant, who was on a bike, the moment they spoke to each other on April 28. Sanchez was forced to come to court to testify. He feared for his safety.

Witness Perez resided in the apartment complex where the shooting occurred. She knew the victims for five years. Torres had the letter "M" tattooed on his face, which signifies the MS-13 gang. Velasco was not in a gang.

Perez testified that ECC considers the neighborhood its turf. She saw the letters ECC painted on walls. She said appellant is an ECC member with the monikers "Newborn" and "Milk." She has known appellant for four years and saw him about once a month at the apartment complex. He told her he is in ECC. Perez identified appellant in a photograph with ECC member "Big Murk." She has known Big Murk for two or three years.

Perez knew Velasco had a relationship with her friend Nelly. Velasco was driving Nelly's BMW the night he was shot. Perez was shown a video in which she identified Velasco and appellant. Perez was nervous about being labeled a "snitch" because of her testimony.

Detective McCoy interviewed witness Reyes after the shooting. Reyes said appellant made incriminating statements at 2:20 a.m. on April 29 while standing near the corner of Avalon and Imperial. Reyes's friend was purchasing cocaine from appellant, who was within five or 10 feet from Reyes. Appellant said he intended to " 'kill that fool right there because they

4

selling the crack right there.' " Reyes explained, "he just saying that, 'Hey, I'm gonna kill this guys because they're in my hood, and they selling drugs in my hood.' " Appellant said the miscreant drug sellers were Hispanic.

Reyes heard appellant say, " 'They always in my alley and so I'm gonna go to the alley and do my thing,' " adding, " 'I'm gonna shoot that fools.' " The alley was near Avalon. Appellant intended to commit the shootings at 3:00 a.m. Reyes and his friend left shortly after appellant uttered his threats.

Reyes said appellant, also known as "Leche," was wearing a gray T-shirt and dark jeans. Shown a photo array, Reyes said number four looked like the man who talked about shooting rival drug dealers but he did not believe it was the same person.[3] Shown a security camera still photo of appellant, Reyes was "a hundred percent" certain appellant was the person who threatened to shoot rivals.

In a second interview with McCoy, Reyes reiterated that the person who threatened to shoot Hispanic drug sellers in the alley is "Leche," the Spanish word for milk. Reyes opined that appellant knew Torres was a member of rival gang MS-13 because Torres had the gang's tattoo on his face. Reyes and McCoy discussed relocating Reyes for his safety. Reyes said, "[I]t's gonna be a problem to me," and, "I'll get in trouble because it's like I'm playing with you guys."

Reyes came to the trial against his will. He did not want to testify. He denied recognizing appellant, or knowing who "Leche" is, or having conversations with Detective McCoy. Reyes denied telling McCoy that he overheard appellant threaten to kill rival

---

[3] McCoy testified that appellant is the person in photo number four.

5

drug dealers. He denied seeing a photo array or saying that photo number four could be the person who talked about committing a shooting. He denied saying when shown a still photo of the person in the alley, "100 percent that's him."

Reyes did not remember if he and a friend encountered appellant the day of the shooting while buying cocaine. Reyes said ECC is a Black gang that controls the area. Reyes denied telling McCoy that their interviews were "going to be a problem."

Reyes was unaware McCoy recorded their first interview. At trial, Reyes initially denied it was his voice on the recording. Eventually, he admitted it was his voice. He did not know why he lied but denied having concerns about his safety. His second interview, at the police station, was audio and video taped; Reyes conceded that he is the person in the video.

Reyes denied knowing Nelly, though he was photographed with her. McCoy testified that Reyes and Nelly were in a relationship and believes they have children. Velasco's body was found in Nelly's BMW. Velasco was seen on videotape trying to light the car on fire before the shooting.

Police gang expert Williams testified about ECC, a Crip gang with about 1,200 members. The shootings occurred in ECC territory. He explained that gangs control territory by committing violent crimes; they commonly engage in drug sales, burglaries, and pimping. Gangs intimidate or shoot at the houses of people who testify against them. By instilling fear in the community, gangs flourish and their crimes go unanswered.

The People offered certified superior court records for two individuals, Island (2014 offense) and Copeland (2015 offense). Appellant did not object and the records were received into evidence. Williams did not testify about the crimes but said he

6

has had "dozens of contacts" with Island and Copeland. He knows they are ECC members from his contact with them, their tattoos, their association with other members, and their admissions that they are ECC members.

Williams identified ECC tattoos on appellant's neck, arms, and stomach. Appellant's moniker is Newborn Milk; he has a milk carton and "milk head" tattooed on his forearm. Williams opined that appellant is in ECC given his tattoos and association with ECC members. People can be assaulted or killed if they sport gang tattoos but are not actual members of the gang.

Williams was familiar with victim Torres, whom he saw in the alleyway and who had a "huge M on his face," a gang tattoo for MS-13. There is a long-standing feud between ECC and local Hispanic gangs.

Given a hypothetical fitting the facts of this case, Williams opined that this crime was committed for the benefit of, in association with, or at the direction of a criminal street gang. A known gang member with gang tattoos confronted a rival gang member. He announced his intent to protect his territory and enhanced his reputation by killing a rival drug dealer on his turf. It is very important for the gang to control narcotics sales in its territory. The shooting increased the gang's control over the area by creating fear in the community.

Gang expert Martin Flores testified for appellant. Flores was exposed to gangs as a youth; has taken classes on gangs; works on gang issues for government and nonprofit organizations; has interviewed hundreds of gang members; and reintegrates gang members on probation into the community.

Flores has worked on cases involving ECC, including murders, attempted murders, burglaries, and kidnappings. The

alley where the victims were shot is claimed by ECC, whose graffiti appears in it. Appellant has ECC tattoos. Flores said ECC "is definitely a criminal street gang."

Flores would not expect a gang member to announce his intent to kill people. Flores agreed there are "consequences for people who sell dope without permission" from the local gang, which range from a verbal warning, a fee or an assault, to "being killed."

## PROCEDURAL HISTORY

An amended information charged appellant with murder (counts 1 and 2) and possession of a firearm by a felon (count 3). (§§ 187, subd. (a), 29800, subd. (a)(1).) It alleged multiple-murder and gang special circumstances, gang enhancements, and firearm enhancements. (§§ 186.22, subd. (b)(1)(C), 190.2, subd. (a)(3), (22), 12022.53, subds. (b)–(d).)

The jury convicted appellant, finding the murders to be in the first degree, the gang special circumstances true, and the enhancements true. Appellant waived his right to a jury trial on the penalty phase. The court sentenced him to a determinate term of two years for possessing a firearm as a felon, consecutive terms of life without the possibility of parole for the murders, plus two terms of 25 years to life for the firearm enhancements.

## DISCUSSION

### 1. Potential Juror Bias

Appellant argues that the court should have questioned all jurors about possible bias. During closing argument, Juror No. 4 and an alternate complained to the bailiff about courtroom spectators. After inquiry, the court discharged Juror No. 4. Appellant contends that his convictions must be reversed because "the jurors became scared" of courtroom spectators and the court

8

did not conduct a sufficient inquiry.  Neither the record nor the law supports appellant's claim that his right to an impartial jury was violated.

Questioned privately, Juror No. 4 complained about "looks we get," though no one made threats.  A "guy that came in with the tattoos . . . was giving us looks.  The lady with the glasses with the bangs.  She just will not stop giving us looks."  Jurors take the elevator together because "we don't feel safe" and "there's no security out there" when they walk to their cars.

The court assured Juror No. 4, "Nobody knows who you are.  I don't even know who you are," and "if at any point in time the jurors want to be escorted to their car[s], we'll do that."  The court said the jury will be sequestered in the deliberation room and "extra precautions" taken.  Defense counsel opined, "Seems like we have to talk to all of them" because "[s]he says they've all been discussing it."

The court questioned Alternate Juror No. 1, who said persons associated with appellant stared at jurors and talked among themselves.  The alternate was "a bit" concerned but felt able to carry out the duties of a juror.  The alternate spoke to Juror No. 4 and did not mention it to others, yet "[e]veryone just says the same thing.  It's kind of scary when we're leaving down the elevator by ourselves."

The court believed staring was not an ongoing problem for the jury, adding, "The hanging together as a group, going down, I don't think that has anything necessarily to do with this case.  I'm not going to fan the flame by inquiring of them individually.  If any of them want to bring it to my attention, I would."  Defense counsel advocated excusing Juror No. 4.  The court agreed.

9

Alternate Juror No. 3 was randomly selected as a replacement. Counsel did not object to this solution.

The court may discharge a juror who, upon a showing of good cause, cannot perform his or her duty. (§ 1089.) The court makes " ' "whatever inquiry is reasonably necessary" ' " once notified that there may be cause to discharge a juror. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1348.) In *Bradford*, reports of juror hostility toward the defendant did not require discharge because "[t]he record does not in any way demonstrate an inability on the part of the jurors to perform their functions." (*Id.* at p. 1352.)

" 'The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court. [Citation.] The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial. . . . [A] hearing is required only where the court possesses information which, if proven to be true, would constitute "good cause" to doubt a juror's ability to perform his duties and would justify his removal from the case.' " (*People v. Osband* (1996) 13 Cal.4th 622, 675–676.) For example, the court may remove a "fragile" juror who expresses fear of the defendants on trial for capital murder after they looked at her. (*People v. Powell* (2018) 6 Cal.5th 136, 156.)

The court removed Juror No. 4 after she voiced personal concerns. As to jurors who did *not* voice concern, the court exercised its "considerable discretion . . . 'whether to conduct a hearing or detailed inquiry.' " (*People v. Prieto* (2003) 30 Cal.4th 226, 274.) Its decision not to question all jurors was not an abuse

10

of discretion.  Comments reported to the court related to a lack of security at the Compton courthouse.  No link was drawn between the lack of security and appellant or his trial.  Only one seated juror, who was replaced, expressed discomfort about members of the public watching the trial.

Appellant claims the court "had a sua sponte duty to inquire of all the jurors to determine if their impartiality had been affected."  Contrary to his claim, court need not inquire of all jurors if only one complains.

*People v. Fuiava* (2012) 53 Cal.4th 622 (*Fuiava*) guides our analysis.  Juror J. was fearful of spectators " 'aligned' " with Fuiava and said jurors discussed the spectators' conduct as they walked to the parking lot.  The court discharged Juror J. but said, " '[U]ntil the other jurors tell us something, it's not necessary to take any action.' "  Fuiava argued on appeal that the court had a duty to investigate whether the jury was improperly influenced.  (*Id.* at pp. 700–701.)  His claim failed.

The court wrote, "The trial court did not abuse its discretion . . . by taking a 'wait and see' approach concerning whether any juror other than Juror J. might have been affected . . . .  [E]ven assuming the truth of what Juror J. had reported to the court—that two people associated with defendant had been talking and pointing at various jurors in a nonthreatening manner, and this had upset Juror J.—these circumstances did not suggest that other jurors were similarly upset to the extent that they, too, might not have been able to perform their duties as impartial jurors. . . . Assuming further that, as Juror J. reported, the subject was mentioned as the jurors were leaving the courthouse on the previous day . . . this similarly did not suggest that anyone other than Juror J. had been upset . . . .  In

11

sum, it was reasonable for the trial court to proceed on the belief that any other juror who might have been affected by asserted spectator conduct would call that circumstance to the court's attention, rather than the court suspending the trial . . . to undertake an inquiry on the subject." (*Fuiava, supra,* 53 Cal.4th at pp. 702–703.)

The court's decision not to conduct an inquiry does not cause uncertainty in the record. (*Fuiava, supra,* 53 Cal.4th at p. 703.) " ' "[I]nability to perform a juror's functions must be shown by the record to be a 'demonstrable reality.' [A reviewing court] . . . will not presume bias." ' " (*People v. Martinez* (2010) 47 Cal.4th 911, 943.) This resolves appellant's claim that "prejudice should be presumed" from a failure to inquire.

We see no abuse of discretion in the court's decision not to question all jurors. Nothing in our record suggests that jurors were biased against appellant, much less that they engaged in misconduct. At most, the record shows they discussed the lack of courthouse security. The decision not to question all jurors, when only Juror No. 4 was upset, did not violate appellant's right to an impartial jury. (*Fuiava, supra,* 53 Cal.4th at p. 703.)

### 2. Gang Findings

The prosecution introduced the certified conviction records of ECC members Copeland and Island and asked police expert Williams about his familiarity with the two men. The purpose was to show ECC is a gang whose members engage in a pattern of criminal activity. (§ 186.22.) In his opening brief, appellant relied on the Sixth Amendment. In a supplemental brief, he asserts that predicate offenses cannot be proved with hearsay testimony from a police expert under *People v. Valencia* (2021) 11 Cal.5th 818 (*Valencia*).

12

Appellant did not object to using conviction records to prove predicate offenses, nor did he object to Williams's testimony. A Sixth Amendment claim is forfeited "by failure to object to the offending evidence." (*Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 314, fn. 3; *People v. D'Arcy* (2010) 48 Cal.4th 257, 289–290.) Appellant's 2017 crime was committed after *People v. Sanchez* (2016) 63 Cal.4th 665 [expert cannot rely on case-specific hearsay unless the facts are independently proven or fall within a hearsay exception].) Post-*Sanchez*, an objection to case-specific hearsay is required to preserve the issue for review. (*People v. Perez* (2020) 9 Cal.5th 1, 7–8.)

Appellant argues that counsel was ineffective for failing to object at trial. He also contends that the issue of whether the evidence violated his rights presents "a pure question of law on undisputed facts."

Section 186.22, subdivision (b)(1) imposes additional punishment when a defendant commits a felony for the benefit of, at the direction of, or in association with a criminal street gang. The People must prove: (1) the group is an ongoing association of three or more persons sharing a common name, identifying sign, or symbol; (2) one of the group's primary activities is the commission of one or more statutorily enumerated criminal offenses; and (3) the group's members must engage in, or have engaged in, a pattern of criminal gang activity. (§ 186.22, subd. (f); *People v. Sengpadychith* (2001) 26 Cal.4th 316, 319–320.)

A " 'pattern of criminal gang activity' " is defined as gang members' individual or collective "commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more" predicate offenses during a defined time period. (§ 186.22, subd. (e).) The

current crime may serve as a predicate offense.  (*People v. Tran* (2011) 51 Cal.4th 1040, 1046.)

In his opening brief, appellant argued "the confrontation clause barred evidence of third party convictions" to prove a pattern of gang criminal activity.  He is mistaken.  The Sixth Amendment bars "testimonial" hearsay.  (*Crawford v. Washington* (2004) 541 U.S. 36, 50–53.)  Conviction records do not offend the constitution because they are not "testimonial." And, under state laws of evidence, the records are admissible to prove an offense was committed.

"[P]ublic records are generally admissible absent confrontation . . . because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial."  (*Melendez-Diaz v. Massachusetts, supra,* 557 U.S. at p. 324.)  The question is whether a statement was developed for the "primary purpose of creating an out-of-court substitute for trial testimony. . . .  Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause."  (*Michigan v. Bryant* (2011) 562 U.S. 344, 358–359; *Ohio v. Clark* (2015) 576 U.S. 237, 245–246.)

Conviction records are not barred by the Sixth Amendment. (*United States v. Weiland* (9th Cir. 2005) 420 F.3d 1062, 1076–1077; *People v. Morris* (2008) 166 Cal.App.4th 363, 370–373.) "Conviction records in general are not testimonial in nature because they are 'prepared to provide a chronicle of some act or event relating to the public employee's duty' and are not 'produced to be used in a potential criminal trial or to determine whether criminal charges should issue.' (*People v. Taulton* (2005)

14

129 Cal.App.4th 1218, 1225.)" (*People v. Thompkins* (2020) 50 Cal.App.5th 365, 412.) The court records document Copeland's and Island's crimes; it was not contemplated at the time of their creation that they would serve an evidentiary purpose, years later, at appellant's trial.

Under state law, conviction records fall within a hearsay exception allowing "admission of qualifying court records to prove not only the fact of conviction, but also that the offense reflected in the record occurred." (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1460–1461; Evid. Code, §§ 452.5, subd. (b)(1) [court record is admissible "to prove the commission . . . of a criminal offense [or] prior conviction"], 1280 [hearsay exception for records made by public employees as part of their duties].) Appellant concedes that state law authorizes the admission of conviction records.

*People v. Garcia* (2020) 46 Cal.App.5th 123 does not assist appellant. It holds that the People may use records "to show the fact of the prior conviction"; however, a complaint from a prior case cannot serve as "evidence proving the date of commission of [the] predicate offense." (*Id.* at pp. 171–172 ["the only competent evidence proving the date of commission of [a] predicate offense was a copy of the complaint"].) *Garcia* is inapposite. Here, the prosecution introduced records created by a court employee. (Evid. Code, §§ 452.5, 1280.) It did not rely on allegations in a criminal complaint—created by the district attorney's office for use at a criminal proceeding—to prove the dates the crimes were committed. (See *Day v. Sharp* (1975) 50 Cal.App.3d 904, 914 [court may not accept the truth of allegations in pleadings just because they are part of a court file].)

Hearsay evidence admitted through an expert may be inadmissible. (*People v. Sanchez, supra,* 63 Cal.4th at p. 680.) Our Supreme Court recently held that hearsay from an expert

cannot be used to prove a pattern of gang crimes under section 186.22.  In *Valencia, supra,* 11 Cal.5th at pages 838–839, a police gang expert "related the facts of three predicate offenses" but his "only knowledge of these offenses came from conversations with other officers and a review of police reports." (*Id.* at p. 827.)  The court wrote that an expert may give "general testimony about a gang's behavior, history, territory, and general operations" as well as "the gang's name, symbols, and colors.  All this background information can be admitted through an expert's testimony, even if hearsay, if there is evidence that it is considered reliable and accurate by experts on the gang." (*Id.* at p. 838.)

By contrast, to prove commission of a predicate offense, an expert cannot simply repeat hearsay statements such as station house conversations with fellow officers.  The expert in *Valencia* "related to the jury facts he gleaned from inadmissible hearsay sources, including police reports, about which he had no personal knowledge."  This was prejudicial error. (*Valencia, supra,* 11 Cal.5th at p. 840.)

*Valencia* does not apply here.  At appellant's trial, Williams did not recite hearsay about the crimes of Copeland and Island from police reports to permit the jury "to improperly rely on that hearsay to conclude the predicate offenses had been proven." (*Valencia, supra,* 11 Cal.5th at p. 840.)  He gave background information about ECC's behavior, history, territory, and general operations.  He testified *from personal knowledge* that Island and Copeland are ECC members based on "dozens of contacts" with them, their gang tattoos, their association with ECC members, and their admissions that they are ECC members.

16

It was undisputed at trial that ECC's primary activities include commission of statutorily enumerated offenses. Defense expert Flores testified that ECC "is definitely a criminal street gang. No doubt about that. And members of [ECC] have committed the spectrum of crimes from burglaries all the way to homicides."

Without objection, certified court records were admitted to prove that ECC members Copeland and Island were convicted of burglary and possession of a firearm by a felon. This is independent admissible evidence. (*Valencia, supra,* 11 Cal.5th at pp. 838–839; Evid. Code, § 452.5.) *Valencia* does not bar the use of court records to establish predicate offenses. In his opening brief, appellant "concedes that the conviction records of Island and Copeland were admissible." The court's records show commission of the offenses and the dates they were committed.

### 3. Jury Instructions

Appellant challenges two jury instructions, contending that one is intrinsically flawed and the other lowered the prosecution's burden of proof. We independently review the legal correctness of an instruction. (*People v. Griffin* (2004) 33 Cal.4th 536, 593, disapproved on other grounds in *People v. Riccardi* (2012) 54 Cal.4th 758, 824, fn. 32.)

#### a. CALCRIM No. 315

Appellant asserts that CALCRIM No. 315 erroneously instructs jurors to consider the certainty of witnesses when evaluating their identification of appellant. The prosecutor used witnesses to identify appellant in security videos. Appellant's defense was that he was misidentified.

Appellant argues that the instruction should have been modified to "eliminat[e] the consideration of a witness's self-

17

assessed certainty in the accuracy of his identification." He admittedly never requested a modification. Appellant forfeited his claim by failing to seek modification at trial. (*People v. Ward* (2005) 36 Cal.4th 186, 213–214; *People v. Covarrubias* (2016) 1 Cal.5th 838, 901.)

Appellant's claim was recently addressed in *People v. Lemcke* (2021) 11 Cal.5th 644, in which the court criticized the certainty factor but held that instructing with it did not constitute error. "[W]hen considered ' "in the context of the instructions as a whole and the trial record" ' [citation], we conclude that listing the witness's level of certainty as one of 15 factors the jury should consider when evaluating an eyewitness identification did not render [defendant's] trial fundamentally unfair or otherwise amount to a due process violation." (*Id.* at p. 661.) In supplemental briefing, appellant concedes that *Lemcke* disposes of his state claim.

Appellant maintains that witness certainty language in CALCRIM No. 315 violates federal law. However, the Supreme Court has stated that "the factors to be considered in evaluating the likelihood of misidentification include . . . the level of certainty demonstrated by the witness." (*Neil v. Biggers* (1972) 409 U.S. 188, 199–200; *Manson v. Brathwaite* (1977) 432 U.S. 98, 114.) The witness certainty language did not diminish the prosecutor's burden of proving the identity of the killer in violation of appellant's constitutional rights.

### b.   CALCRIM No. 370

The court instructed the jury that the prosecution did not have to prove appellant had a motive to commit the charged

18

crimes.[4]  Appellant contends that the instruction, CALCRIM No. 370, "impermissibly lowered the prosecution's burden of proof on the gang-murder special circumstance," which requires that the defendant intentionally kill the victim to further the activities of a criminal street gang.  (§ 190.2, subd. (a)(22).)[5]  We conclude that the instruction was properly given.

The motive instruction in CALCRIM No. 370 does not interfere with the jury's special circumstance finding that appellant had intent to kill to further the activities of a gang. Motive and intent are distinct.  "[M]otive is the 'reason a person

---

[4] The instruction reads:  "The People are not required to prove that the defendant had a motive to commit any of the crimes charged.  In reaching your verdict you may, however, consider whether the defendant had a motive. [¶] Having a motive may be a factor tending to show that the defendant is guilty or that [the] special circumstance or allegation is true.  Not having a motive may be a factor tending to show the defendant is not guilty or that [the] special circumstance or allegation is not true."  (CALCRIM No. 370.)

[5] The jury was instructed with CALCRIM No. 736, which reads:  "The defendant is charged with the special circumstance of committing murder while an active participant in a criminal street gang in violation of Penal Code section 190.2(a)(22). [¶] To prove that this special circumstance is true, the People must prove that:
"1.  The defendant intentionally killed the named victims;
"2.  At the time of the killing, the defendant was an active participant in a criminal street gang;
"3.  The defendant knew that members of the gang engage in or have engaged in a pattern of criminal gang activity;
"AND
"4.  The murder was carried out to further the activities of the criminal street gang."

chooses to commit a crime,' but it is not equivalent to the 'mental state such as intent' required to commit the crime." (*People v. Cash* (2002) 28 Cal.4th 703, 738.)  Though intent to kill is an element of a murder charge, motive to kill is not.  (See *People v. Guerra* (2006) 37 Cal.4th 1067, 1135 [motive is not an element in a rape-murder prosecution, unlike "child annoyance," which requires a showing that defendant was motivated by unnatural or abnormal sexual interest], overruled on other grounds in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

Appellant's claim was addressed in *People v. Fuentes* (2009) 171 Cal.App.4th 1133, where the court concluded that the motive instruction does not contradict the intent requirement in section 190.2.  When combined, the two instructions "told the jury the prosecution must prove that Fuentes intended to further gang activity but need not show what motivated his wish to do so." (*Id.* at pp. 1139–1140.)

The prosecutor had to show appellant intended to kill the victims to benefit his gang.  (§ 190.2.)  Appellant may have been motivated by a desire to eliminate a rival gang member, protect ECC control over its turf, enhance his reputation in ECC, deter interlopers from selling drugs, or frighten the community into silence so ECC's criminal enterprise can flourish.  These are motivating factors listed by the police and defense experts.  The prosecutor did not have to speculate, let alone prove, which one (or all) of these factors motivated appellant to kill the victims.

Contrary to appellant's claim, CALCRIM No. 370 did not relieve the jury of its duty to make the special circumstances intent finding.  CALCRIM No. 736 required that "the People must prove [¶] . . . [¶] the murder was carried out to further the activities of the criminal street gang."  Another instruction

20

required that "the People prove that [¶] . . . [¶] the defendant intended to assist, further, or promote criminal conduct by gang members." (CALCRIM No. 1401.) As to both murders, the jury expressly found that appellant had the specific intent to promote or further gang criminal activities. There was no instructional error.

### 4. Sentence and Abstract of Judgment

The jury convicted appellant of count 3, possession of a firearm by a felon. At sentencing, the court said, "As to Count 3 you are to serve two years in state prison, time served for the time you've already been in. No additional time as to Count 3." The abstract of judgment does not show if count 3 is consecutive or concurrent with the murder counts. Appellant contends that the abstract must be corrected to show a concurrent sentence in count 3. We agree.

The court must give reasons for sentencing choices. (§ 1170, subd. (c).) To ensure uniformity in sentencing, "it is necessary for the court to state for the record why consecutive sentencing is warranted." (*People v. Walker* (1978) 83 Cal.App.3d 619, 622; Cal. Rules of Court, rule 4.406(b)(5).) The court gave a reason for imposing consecutive sentences for counts 1 and 2, saying there was a "significant break between the shooting of Mr. Torres and the shooting of Mr. Velasco." By contrast, it offered no reason for imposing a consecutive sentence for count 3. A concurrent term is imposed if the court did not specify a consecutive sentence. (§ 669, subd. (b).)

Appellant next asserts that the abstract of judgment and minute order should be corrected to remove references to the gang enhancements. (§ 186.22, subd. (b)(1)(C).) The transcript shows that the court, citing section 186.22, said that as to counts

21

1 and 2 it was "going to strike the punishment" for the gang enhancement. The minute order and abstract of judgment state that the enhancement was stayed.

The court cited section 1385, which allows it to "strike or dismiss an enhancement [or] the court may instead strike the additional punishment for that enhancement in the furtherance of justice." (§ 1385, subd. (b)(1).) Striking an enhancement's punishment does not defeat the jury's factual finding that the allegation is true. Instead, it " 'would retain the fact of the enhancement in the defendant's criminal record, but would not add any punishment.' " (*People v. Fuentes* (2016) 1 Cal.5th 218, 225–226.) If the court exercises discretion to strike the punishment, it should not strike the enhancement. (*Id.* at p. 226.)

Appellant is mistaken that all references to the gang enhancement must be "removed." The court did not strike the gang enhancement in its entirety, only "the punishment" for it. The abstract of judgment states that sentence on the gang enhancement allegation is "stayed." This should be changed: Section 2 of the "attachment page" to the abstract allows the court to list "enhancements charged and found to be true" and to denote " 'PS' for punishment struck."

Finally, respondent concedes that the abstract of judgment should be corrected because appellant is entitled to one additional day of presentence custody credits, a total of 671 days.

## DISPOSITION

The abstract of judgment is ordered corrected to reflect that defendant Larry (1) is sentenced to a concurrent term of imprisonment on count 3, possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)(1)); (2) punishment for the gang enhancements found to be true (Pen. Code, § 186.22) is stricken; and (3) he has 671 days of presentence custody credits. The superior court is ordered to forward a certified copy of the corrected abstract to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:



ASHMANN-GERST, J.



CHAVEZ, J.