Filed 4/3/23  P. v. Batres CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ANDREW BATRES,<br><br>Defendant and Appellant. | B313908<br><br>(Los Angeles County<br>Super. Ct. No. TA139632) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ricardo R. Ocampo, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Tanya Dellaca, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Roberta L. Davis and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Andrew Batres appeals from his convictions for the gang-related second degree murder of Stephen Johnson and possession of a firearm by a felon. Batres was tried along with codefendants Cedrick Devontae Parker and Deandray Bonner, who were charged not only with the Johnson murder, but also with multiple other murders, attempted murders, and other violent crimes including robbery, carjacking, and assault with a firearm, none of which involved Batres.

On appeal, Batres argues the trial court erred by trying him jointly with his codefendants. Batres contends the extensive evidence of Parker's and Bonner's violent acts and gang affiliation was inflammatory and prejudicial to him, and led the jury to find him guilty by association.

Batres further argues substantive amendments to the criminal street gang statute enacted after his conviction are retroactive, and require reversal of the gang findings against him as well as the firearm enhancement that relies on those gang findings. Batres asserts the new requirement under Penal Code section 1109 that gang enhancements be tried separately from the underlying offense similarly is retroactive, and entitles him to a new trial on the murder charge as well.

Finally, Batres argues other amendments to the Penal Code, as well as recent Supreme Court authority require reversal and resentencing on the firearm enhancement and the firearm possession count.

We find no error or unfairness in the trial court's decision to try Batres jointly with Parker and Bonner. The prosecution's theory was that the Johnson murder was a planned, gang-motivated murder in which Batres was a willing and knowing participant. Evidence of Parker's and Bonner's other gang-

motivated crimes around the same time tended to show the murder was part of a pattern of planned, gang-motivated violence, and not a spontaneous and unplanned event of which Batres might have been ignorant. Evidence of Parker's and Bonner's other crimes also was relevant because ballistic evidence from the Johnson murder matched ballistic evidence at the scenes of those other crimes.

The Attorney General concedes, and we agree, that the gang findings and firearm enhancement must be reversed in light of amendments to the Penal Code, which have changed the elements of the gang enhancement. We hold, however, that any failure to bifurcate under section 1109 was harmless, given that much of the gang evidence would have been admissible to prove the murder charge, and the evidence against Batres apart from the gang evidence was strong.

Finally, we agree with Batres that changes to the Penal Code affecting the trial court's discretion in selecting the lower, middle, or upper term for sentencing require resentencing on the firearm possession count.

Accordingly, we affirm in part, reverse in part, and remand for retrial on the gang and firearm enhancements and for resentencing.

## BACKGROUND

### 1. *Charges*

On August 21, 2018, the People filed a 27-count information based on offenses committed between January 17, 2016, and March 22, 2016. Count 10 charged Batres, Parker, and Bonner with the murder of Steven Johnson on or about March 21,

3

2016 (Pen. Code,[1] § 187, subd. (a)). The information alleged firearm enhancements against all defendants based both on personal discharge of a firearm and a principal's discharge of a firearm (§ 12022.53, subds. (c)–(e)). The information further alleged the murder was committed for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)(1)(C)).[2] Count 27 of the information charged Batres with one count of possession of a firearm by a felon (§ 29800, subd. (a)(1)).

The remaining counts in the information did not involve Batres. Parker and Bonner were jointly charged with conspiracy to commit murder (§ 182, subd. (a)(1)), carjacking (§ 215, subd. (a)), second degree robbery (§ 211), two counts of attempted murder (§§ 664/187, subd. (a)), driving or taking a vehicle without consent (Veh. Code, § 10851, subd. (a)); and assault with a firearm (§ 245, subd. (a)(2)).[3]

The information charged Parker individually with an additional count of murder (§ 187, subd. (a)), shooting at an occupied vehicle (§ 246), and five counts of possession of a firearm by a gang member (§ 25850, subd. (a)).

---

[1] Unspecified statutory citations are to the Penal Code.

[2] As to the Johnson murder, the information alleged special circumstances based on multiple murders and gang-related murder (§ 190.2, subds. (a)(3), (a)(22)), but these allegations were not presented to Batres's jury.

[3] Deandre Clayton was charged as an additional defendant on the conspiracy and two attempted murder counts. Clayton was not tried with Batres, Parker, and Bonner, and is not party to this appeal.

4

The information charged Bonner individually with robbery (§ 211), assault with a firearm (§ 245, subd. (a)(2)), burglary (§ 459), an additional count of murder (§ 187, subd. (a)), attempted murder (§§ 664/187, subd. (a)), shooting at an occupied vehicle (§ 246) (count 25), and four counts of possession of a firearm by a felon (§ 29800, subd. (a)(1)).

As with the Johnson murder, for these additional crimes the information alleged criminal street gang enhancements on all counts except the firearm possession counts, and various firearm enhancements on all counts except the firearm possession counts and the count for driving or taking a vehicle without consent. The information further alleged special circumstances under section 190.2, subdivisions (a)(3), (21), and (22) on the murders for which Parker and Bonner were individually charged.

## 2. *Structure of trial*

The prosecution sought to try Batres jointly with Parker and Bonner, and successfully moved to consolidate the cases. The prosecution requested, however, that Batres have a separate jury from Parker and Bonner, because the prosecution intended to introduce statements Batres made to an undercover agent, and those statements would not be admissible against Parker and Bonner.

Batres moved to sever his trial from that of Parker and Bonner, arguing that in a joint trial, Batres's jury would hear "voluminous evidence" concerning Parker's and Bonner's other gang-related offenses, in which Batres was uninvolved. Batres argued this created a risk that his jury would find him guilty merely based on his association with Parker and Bonner.

The prosecution argued evidence of Parker's and Bonner's other charged offenses was cross-admissible in Batres's case,

5

including ballistic evidence linking the firearms used in the Johnson murder to other crimes perpetrated by Parker and Bonner, and evidence of Parker's and Bonner's gang affiliation to show motive for the Johnson murder and to show it was committed for the benefit of a criminal street gang.

The trial court stated the trial would proceed with two juries, and the court would evaluate as necessary whether certain evidence pertinent to Parker and Bonner was inadmissible against Batres. On appeal, the parties do not dispute that Batres's jury heard all, or nearly all evidence presented at trial, including the evidence pertaining to the crimes in which Batres was not involved.

### 3. Codefendants' offenses prior to Johnson murder

We briefly summarize the circumstances underlying the crimes of which Parker and Bonner, but not Batres, were charged, evidence of which the prosecution presented at trial.

Parker and Bonner were members of the Denver Lane Bloods gang. On January 17, 2016, Parker and Bonner stole a vehicle from Edward F. at gunpoint. Approximately 35 minutes later, Parker and Bonner used Edward F.'s vehicle to perpetrate a drive-by shooting at several persons, wounding Elliot W. The shooting took place in the territory of the Hoover Criminals, a rival gang to the Denver Lane Bloods.

On February 21, 2016, Bonner fired multiple shots from his vehicle at a vehicle occupied by Nathaniel Ancar and Lateshia W., killing Ancar.

On March 18, 2016, Parker fired a gun from his vehicle, killing Kaelen Warren, who was riding past on a minibike.

On March 20, 2016, Parker and Bonner approached several individuals standing near a liquor store and displayed their

handguns. One of the individuals shot at Parker and Bonner, who returned fire. The area was claimed by Crip gangs, rivals to the Denver Lane Bloods.

On March 21, 2016, around 1 p.m., Bonner entered the motel room of Deon E. and robbed him at gunpoint.

## 4. *The Johnson murder*

### a. Shooting and arrests

At approximately 11:20 p.m. on March 21, 2016, a witness, who was inside her home near the intersection of 88th Street and Baring Cross Street, heard gunshots. Looking out her window, she saw someone lying on the ground, and a young Black man with a gun run towards a Mercedes and climb into the back seat. The witness observed that the driver also was a Black male. The Mercedes drove off.

The man lying on the ground was Steven Johnson. He had been shot five times and killed. Police found numerous spent ammunition cartridges at the scene in .380 and .40 caliber.

At approximately 12:07 a.m. on March 22, 2016—less than an hour after Johnson was killed—a deputy sheriff in his patrol car observed a vehicle make a left turn without signaling. Intending to initiate a traffic stop, the deputy followed the vehicle into the parking lot of an apartment complex on San Pedro Street. The apartment complex was approximately a 10-minute drive from 88th Street and Baring Cross Street.

Once in the parking lot, the deputy saw another vehicle, a silver Mercedes, backing out of a parking stall. As the deputy got out of his patrol car, three Black males got out of the Mercedes and ran away, leaving the doors open.

Less than a minute later, the driver of the Mercedes got out and ran over to the area where the apartment complex's trash receptacles were. The deputy followed, and saw the driver, later identified by the deputy as Parker, place a black object on the ground. The deputy and his partner detained Parker, and the deputy located a pistol at the spot where he had seen Parker drop the black object. The pistol was loaded with .40 caliber rounds.

Having detained Parker, the deputy and his partner searched the Mercedes. They found a plastic bag with five live .380 caliber rounds, and an expended .380 caliber casing lying on top of the windshield wiper.

As the deputy and his partner were searching the Mercedes, a man the deputy later identified as Batres approached them from the east side of the parking lot. Batres appeared nervous, was breathing fast, and was sweating a bit. He told the deputy the Mercedes was his, but two individuals had stolen it from him at gunpoint 45 minutes earlier, a block or two north from where they were.

The deputy showed Parker to Batres and asked if he could identify him. Batres said he did not know Parker.

The deputy determined the Mercedes belonged to a Rodolfo S. Rodolfo S., a mechanic, confirmed he had loaned the Mercedes to Batres while he repaired Batres's car. The car was then released back to Batres.

The next day, police encountered Bonner, who fled but was caught and arrested with the assistance of a K-9 unit. Police found a loaded .40 caliber handgun in Bonner's vehicle.

### b.    Batres's statements to undercover agent

Months later, in August 2016, Batres was placed in custody in connection with a murder for which he ultimately was not

charged.  The police conducted a "*Perkins*" operation[4] in which they placed an agent posing as a fellow inmate into a cell with Batres and recorded their conversation.  Batres discussed both the uncharged murder and the Johnson murder with the *Perkins* agent; the parties do not dispute that in that conversation Batres referred to the uncharged murder as "the first one" and the Johnson murder as "the second one."  Throughout the conversation, Batres referred to an individual nicknamed "Braze," and another individual nicknamed "Kilo."  The prosecution established, and Batres on appeal does not dispute, that these nicknames referred to Bonner and Parker, respectively.  We do not purport to summarize the entire conversation, but highlight relevant portions.

Batres told the agent the police had told him they had found his DNA at both crime scenes.  Batres said, "For the first one, I did not touch no gun, but for the second one [i.e., the Johnson murder], I know I did. . . .  [B]ut I know I didn't bust it."  As to the "[s]econd one," Batres said, "Braze did the whole thing."  Batres stated he did not know anything about the first murder, "[b]ut I know something about the second, for sure, for sure."

The agent asked if Batres might have left his fingerprints on any shell casings, and Batres answered, "I didn't have no gloves or nothing."  The agent asked if Batres thought Bonner told the police that Batres was the shooter, and Batres said, "I don't know.  [unintelligible]  I don't 'cause I—It's like, it's like I know what I did but I didn't finish it though.  You feel me?  The . . . on bloods, like the . . . hop out of the car and . . . just did the

---

[4] *Illinois v. Perkins* (1990) 496 U.S. 292.

9

thing, did the whole thing." Later, "But I already know—but I know what I did."

The agent asked if on "the second one," in addition to Bonner, "Kilo" [i.e., Parker] also was there. Batres said, "Kilo was with me too." Batres again said that Bonner "finished the whole fool off . . . . He told me. . . . Denver Lane Blood, boom, boom, boom." Asked what guns they had, Batres said, "The second one, they had . . . a .40."

The agent asked what car the police had told Batres was involved in the Johnson shooting, and he said, "A Benz truck." Asked if it was his, he said, "Yeah, yeah, it was, it was my car. I got robbed. I'm saying I got robbed."[5]

The agent suggested Parker and Bonner must be talking to the police for the police to know so much. Batres said, "Somebody's telling." The agent asked if there might be other witnesses, asking, "When ya'll got through popp'n, did you see anybody outside?" Batres answered, "Hell no, it wasn't—I feel there wasn't nobody outside."

The agent asked how Parker and Bonner were acting when they drove away after the shooting. Batres said, "[T]hey did some crazy shit, man. They did some, crazy shit. Kilo froze up, once he see the police coming into the uh, to the apartments. Then, it's crazy 'cause, he still . . . had a chance to run . . . ." Batres explained that Parker got caught with a .40 caliber pistol, and the police found the gun Bonner used "probably the next night."

---

[5] Given Batres's unequivocal statements to the agent that he was present with Bonner and Parker at the Johnson shooting, his statement that the car was stolen from him appears to be Batres telling the agent his explanation to the police, rather than actually claiming to have had the Mercedes stolen from him.

The agent suggested Batres should have "popped" Parker and Bonner before they snitched on him, and Batres said, "I should have, I should have, and should have popped Kilo for just freezing up . . . . What the fuck? You got a burner."

Batres said he never touched the .40 caliber pistol, and did not do any shooting. "I didn't do nothing. [unintelligible] I feel like I'm being framed right now." The agent said the police probably wanted the "trigger man," and suggested Batres tell them Parker and Bonner did the shooting. Batres said, "That's still conspiracy [to commit murder], though." The agent said it wouldn't be conspiracy if Batres was unaware of what Parker and Bonner planned to do. Batres said the police would ask, "[W]hy was y'all going on that side? What was the purpose of you guys even going around that area?"

The agent told Batres it was a mistake to tell the police he had been carjacked, because someone had identified Batres as being at the Johnson shooting. Batres said, "But I know, but I know for a fact I wasn't over there . . . ." The agent sought to clarify that Batres was talking about the first, uncharged murder not the Johnson killing. Batres said, "I wasn't there either, so that's like I got robbed. So basically I'm getting framed, I'm getting framed."

The agent asked if the police had the "burners" from the Johnson killing. Batres said, "[N]ot the .380, but I know for a fact they got the .40, the fuck'n .45.[6] That I didn't even touch." The agent asked if the .380 caliber weapon was "in the hood," and Batres said, "Hell naw, that shit gone." The agent urged Batres

---

6 It is unclear to what .45 caliber weapon Batres refers. He may have mistakenly believed one of the two .40 caliber handguns used by Parker and Bonner was of a different caliber.

to be sure about that, and Batres said, "[H]ell naw that motherfucker is clean. I cleaned that motherfucker real good. Hell yeah."

The agent and Batres continued to discuss the events of the Johnson killing. The agent asked if Batres got out of the car during the shooting, and Batres said, "Hell naw, I didn't get out of the car with them, hell naw." Later, "I was in the car the whole time." He reiterated, "I didn't do nothing. I didn't do no shooting."

### c.    Other evidence

The area in which Johnson was shot was claimed by the Hoover Criminals gang. A detective testified he learned in his investigation that Johnson was affiliated with that gang. When police later returned to the crime scene, they found writing on a fence indicating Johnson's nickname, "Stelo," with the letters "H.I.P.," meaning "Hoover in Peace."

Ballistics evidence linked the shell casings found in the Mercedes and at the scene of the Johnson murder to other crimes committed by Parker and Bonner. Casings in .40 caliber found at the March 20, 2016, liquor store shootout matched casings at the Johnson murder, and were all fired from the gun Parker discarded. Different .40 caliber casings recovered from the Warren killing and the liquor store shootout matched casings found at the Johnson murder, and all were fired from the gun found in Bonner's car. The .380 caliber casings matched casings recovered from the shooting of Elliot W. and the killing of Nathaniel Ancar, and all were fired from the same weapon. Police never found that weapon.

Security camera footage showed Batres in the Mercedes the afternoon before Johnson's murder. Other surveillance video

12

showed a silver Mercedes SUV, similar to the one the mechanic loaned to Batres, being driven near the area of the Johnson shooting shortly before and shortly after the shooting.

Batres's cell phone records indicated he terminated his account the day after the Johnson killing. His records showed at some point he had made a call to a number associated with Parker.

### 5. *Gang evidence*

To prove Parker and Bonner were members of the Denver Lane Bloods gang, the prosecution called Detective Christian Mrakich to opine on pages from Bonner's Facebook account as well as videos from that account showing Parker and Bonner singing together while throwing gang signs, Bonner throwing gang signs by himself, and Bonner displaying his tattoos.

Mrakich explained how the Facebook posts and messages indicated Parker's and Bonner's affiliation with the Denver Lane Bloods. For example, he interpreted language used in the Facebook posts and messages to indicate either Bonner's fealty to the Denver Lane Bloods or disrespect to rivals of that gang, including the Hoover Criminals. Posts referred to a "homie" called "Keylow," whom Mrakich explained was Parker. Some posts referred to firearms, and in three posts, Parker referred to himself or his friends as a "shooter" or "shooterz." In several posts, Bonner purported to be in rival gang territory. In one exchange, someone reported being shot by the Hoover Criminals.

The Facebook posts included some photographs of Bonner wearing clothing referencing the Denver Lane Bloods, making hand gestures disrespectful to the Hoover Criminals, or standing in front of Denver Lane Bloods graffiti. Parker was in one of the photographs also making gestures disrespectful to the Hoover

13

Criminals. Another photograph showed Bonner and Parker with other individuals Mrakich identified as Denver Lane Bloods members. Mrakich interpreted some of the Facebook messages as Bonner attempting to obtain a gun.

Mrakich testified regarding the Facebook videos, which he explained showed Bonner, or Bonner and Parker together, throwing gang signs, and Bonner displaying his tattoos. He also analyzed for the jury photographs of Bonner's tattoos, and explained how the tattoos were connected to the Denver Lane Bloods. Mrakich stated that Parker's tattoos were not gang related.

Mrakich opined that Bonner was a member of the Denver Lane Bloods based on his tattoos, Facebook posts and messages with gang jargon, photographs and videos of Bonner displaying gang signs, Bonner's association with other gang members, and recorded calls to which Mrakich had listened in which Bonner used gang jargon. Mrakich further opined that Bonner was an active gang member given how active he was on Facebook with gang-related messages.

Mrakich similarly opined that Parker was an active member of the Denver Lane Bloods based on Bonner's Facebook postings referring to Parker, the photographs and videos, Parker's association with other gang members, and recorded calls to which Mrakich had listened.

As for Batres, Mrakich opined that he was an active member of the Athens Park Bloods gang, which was a "neighboring Blood gang" to the Denver Lane Bloods and one of the Denver Lane Bloods "closest allies." Mrakich said Batres's moniker was "Wolf or Wolfy." Mrakich discussed Batres's tattoos and explained that several indicated affiliation with the Athens

14

Park Bloods and enmity towards rival Crip gangs. Mrakich referred to photographs of Batres with other gang members throwing gang signs that were derogatory to the East Coast Crips, the primary rivals of the Athens Park Bloods. Mrakich had also listened to recorded conversations in which Batres used gang-related slang.

Mrakich opined that, although Batres was an active gang member, Mrakich would "probably not" "put him on the same level as Mr. Parker and Mr. Bonner," "but maybe aspiring to be or on his way to be."

Mrakich also provided background information about the Denver Lane Bloods. He described the gang's primary activities as murder, robbery, drug sales, extortion of businesses, witness intimidation, pimping or pandering, sex trafficking, and white collar crime including fraud and forgery.

To establish the gang's predicate felonies, Mrakich testified about a robbery committed in 2015 by Joseph Quentin Tarver, whom Mrakich opined was a gang member. Mrakich knew of the crime because he was involved in the investigation. Mrakich also testified about a series of crimes, including robberies, committed by Kwabente Smith, whom Mrakich testified also was a gang member. Mrakich explained he knew about Smith's case because the division in which Mrakich worked was not particularly large, and "when you've been there a long time, there's people you know and you take interest in their arrests and there are certain events that happened in the arrest that make them of interest, interesting or exciting; and this just happened to be one of them."

Mrakich said there was no active feud or war between the Athens Park Bloods and Hoover Criminals, but in the past Athens Park members had joined with Denver Lane members to

commit crimes against Hoovers, and Hoovers had committed crimes against the Athens Park and Denver Lane gangs as well.

Mrakich explained that murder, assault, robbery, and other violent crimes benefit gangs because the crimes "promote [the gang's] reputation as a fearsome gang," which then allows the gang to "operate[ ] [it's] criminal empire . . . with impunity without having any fear of people telling on them or snitching on them, because [the gang has] shown what the consequences could be." Mrakich explained that the reputations of individual gang members similarly benefit from commission of violent crimes.

The prosecution presented Mrakich with hypotheticals mirroring the various crimes preceding the Johnson murder of which Parker and Bonner were accused. Mrakich opined that each was committed for the benefit of, in association with, or at the direction of a criminal street gang.

The prosecution then presented a hypothetical mirroring the circumstances of the Johnson shooting, namely two Denver Lane Bloods members and an Athens Park Bloods member driving into Hoover Criminals territory and shooting a Hoover Criminals member at close range. Mrakich again opined that the shooting was committed for the benefit of, in association with, or at the direction of a criminal street gang. He opined the circumstances showed planning, with three gang members arming themselves, obtaining a vehicle, and driving into rival territory. "[T]hat means there is no misunderstanding between the occupants of that vehicle what they are there to do."

Mrakich opined that the benefit of the Johnson shooting to the gang and to the gang members would be "reputation amongst each other, building a strong bond between individual gang members, showing their ruthless reputation, their willingness

16

and eagerness . . . to go into a rival hood to execute somebody." "[M]urder is the ultimate crime, and committing that crime, obviously, will skyrocket the reputation of that particular gang." It did not affect Mrakich's opinion that the perpetrators were members of allied gangs rather than all members of the same gang.

The prosecution asked Mrakich to assume that all of the prosecution's hypotheticals were "connected" in that one or more of the same individuals was involved in each of the crimes. Mrakich stated that if the crimes were connected in that way, it "bolster[ed]" his opinion the crimes were for the benefit of, at the direction of, or in association with a criminal street gang. He explained that although even one crime increases the reputation of a gang, a "series of violent crimes together" has an "exponential" benefit in increasing the gang's fearsome reputation. Gang members committing crimes together also serves as a "training tool" to "learn and practice their . . . trade or their skill," and the gang's improved reputation is a "very attractive recruitment tool."

### 6.     *Conviction and sentencing*

Batres's jury convicted him of second degree murder, and found true the allegation that he committed the crime for the benefit of, at the direction of, or in association with a criminal street gang. The jury found not true the allegation that Batres personally discharged a firearm causing injury and death, but found true the allegation that a principal in the offense discharged a firearm causing great bodily injury. The jury also convicted Batres of possession of a firearm by a felon.

At sentencing, the trial court found as factors in aggravation that the crime involved great violence, great bodily

17

harm, a threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness or callousness; the victim was particularly vulnerable; the circumstances of the crime indicated planning, sophistication, or professionalism; and Batres had engaged in violent conduct indicating a serious danger to society. As factors in mitigation, the trial court found Batres had a lesser role than his codefendants in the crime, and he had no significant prior record of criminal conduct.

The trial court sentenced Batres to 15 years to life for the murder, with a consecutive term of 25 years to life for the firearm enhancement. Finding the factors in aggravation outweighed the factors in mitigation, the court imposed the high term of three years for the firearm possession count, to be served concurrently with the indeterminate sentence. Batres's total sentence therefore was 40 years to life. The court awarded credit and imposed fines and fees.[7]

Batres timely appealed.

---

[7] Parker and Bonner's jury found them guilty of all charges, including the Johnson murder, and found all special circumstances and most enhancement allegations true. Parker and Bonner each received two terms of life without possibility of parole, along with determinate and indeterminate terms in excess of 200 years to life. (*People v. Parker et al.* (Sept. 24, 2021, B305256) [nonpub. opn.].) We affirmed the judgments against Parker and Bonner in an unpublished opinion. (*Ibid.*)

## DISCUSSION

### A. The Trial Court Did Not Abuse its Discretion In Trying Batres With Parker and Bonner, Nor Was the Joint Trial Grossly Unfair

Batres argues the trial court's decision to try him jointly with Parker and Bonner was an abuse of discretion that denied him a fair trial.

Section 1098 states in relevant part, "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials." Our Supreme Court has interpreted this section to indicate the Legislature's " ' "preference for joint trials." [Citation.]' [Citation.]" (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 378 (*Bryant*).)

The trial court nonetheless has the discretion to order separate trials " ' "in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony." [Citations.]' . . . [Citation.]" (*Bryant, supra,* 60 Cal.4th at p. 379.)

" 'We review a trial court's denial of a severance motion for abuse of discretion based on the facts as they appeared at the time the court ruled on the motion. [Citation.] If the court's joinder ruling was proper at the time it was made, a reviewing court may reverse a judgment only on a showing that joinder " 'resulted in "gross unfairness" amounting to a denial of due process.' " ' [Citation.]" (*Bryant, supra,* 60 Cal.4th at p. 379.)

Batres contends he was prejudiced by his jury hearing evidence of Parker's and Bonner's other crimes, to which he had

19

no connection, as well as the extensive evidence of Parker's and Bonner's involvement with the Denver Lane Bloods.  He argues, "The evidence related to Parker and Bonner and their other crimes . . . was wholly unrelated to [Batres] and any role he played in his charged crimes, was extensive, dominated the trial, forced [Batres's] jury to sit through days of witness testimony not related to his charges, and prejudiced [Batres]."  Batres argues the joint trial "prevented his jury from properly assessing [his] guilt, level of culpability or innocence for the Johnson murder on an individual and independent basis," and "any doubt as to [Batres's] role . . . was resolved by his mere association with Bonner and Parker and his presence in court with both men."

Batres contends the "central issue" before his jury was whether he participated in the murder of Johnson and did so for the benefit of the Denver Lane Bloods, "not whether the murder was committed as part of Bonner's and Parker's brazen gang related crime spree."  Batres argues the evidence against him would have been "vastly different" had he been tried separately. "For example," he asserts, "tried alone, [Batres's] jury [would] not hear any of the evidence used to prove Bonner's and/or Parker's guilt for the other attacks, and the amount of inflammatory gang evidence would have been drastically reduced, since [Batres's] jury would not need to find Bonner's and Parker's other crimes were gang related.  As a result, the prosecution would be unable to aggregate the codefendants' crimes into a global hypothetical question presented to the gang expert in order to ask whether the Johnson murder [w]as gang related.  Rather, had [Batres] been tried separately, and the prosecution tried to introduce the details of his codefendants' other unrelated crimes, such evidence would surely be excluded as irrelevant, cumulative and being

more prejudicial than probative, or, at minimum drastically limited."

It is true that, apart from the Johnson murder, Batres was not charged with the other crimes of which Parker and Bonner were accused. This does not mean the entirety of the evidence of those other crimes, including the evidence they were gang-related, was not relevant to prove the circumstances of the Johnson murder such that significant portions of that evidence would be inadmissible in a hypothetical separate trial.

The prosecution sought to prove that Batres joined Parker and Bonner in a planned, gang-motivated killing. Evidence that Parker and Bonner had engaged in a pattern of violent, gang-motivated crimes in the months and days preceding the Johnson killing, several of which Parker and Bonner committed together, tended to show Johnson's murder was not an isolated, spontaneous incident, but part of that pattern of gang-motivated violence. If the prosecution established that pattern, it would weigh against an inference that the Johnson shooting was unplanned, that it was not gang-related, or that Batres was ignorant of Parker's and Bonner's intent when the three men drove into a rival gang's territory that night. Thus, even if Batres were tried separately, evidence of Parker's and Bonner's other crimes would be relevant and admissible to show the Johnson murder was part of a larger pattern of gang violence perpetrated by Parker and Bonner, and therefore both planned and gang-motivated.[8]

---

[8] Our conclusion does not assume or depend upon evidence that Batres knew of Parker's and Bonner's earlier crimes. Rather, the evidence that Parker and Bonner had planned and committed other gang-related crimes together suggested that the

Evidence of the other crimes also was relevant because of the ballistics evidence connecting the weapons used in the Johnson shooting to other crimes in which Parker and Bonner were involved. The fact that the same weapons were used at other crime scenes at which Parker and Bonner were identified bolstered the prosecution's position that Parker and Bonner perpetrated the Johnson murder as part of their pattern of gang-motivated violence, which in turn bolstered the prosecution's position that Batres similarly had participated in a gang-motivated murder.

Given the prosecution's theory that the Johnson killing was a planned, gang-motivated murder, and the cross-admissibility of the evidence of Parker's and Bonner's other crimes in support of that theory, the trial court did not abuse its discretion when it denied Batres's motion for a separate trial.

We further hold the trial court's decision did not result in gross unfairness amounting to a denial of due process. As our Supreme Court has stated, "Naturally, anyone facing prosecution would rather be tried on a single charge, rather than multiple counts. Likewise, an accused would rather not be associated in the jury's mind with other potentially unsavory characters." (*Bryant*, *supra*, 60 Cal.4th at p. 381.) Nonetheless, a joint trial is not "unfair" simply because of "the possibility that one defendant's chance of acquittal is reduced." (*Id*. at p. 380; see *id*. at p. 381 ["Defendants are constitutionally entitled to a fair trial, not one that gives them the best possible chance for an acquittal."].)

---

Johnson killing similarly was planned, which would tend to suggest that Batres was aware of that plan.

Also, the fact that some evidence is introduced in the joint trial that might not have been introduced in a separate trial does not render a joint trial unfair: "[T]he issue is not whether a theoretical separate trial of one defendant would have been different, but whether the joint trial that actually occurred was in some manner prejudicially unfair or unreliable." (*Bryant*, *supra*, 60 Cal.4th at p. 381.) Thus, "[t]he argument that some evidence admitted at a joint trial might not have been admitted at a separate trial misses the mark." (*Ibid*.)

As we have explained, much of the evidence to which Batres objects would have been relevant and admissible in a separate trial, including the evidence of Parker's and Bonner's other gang-motivated crimes. Perhaps some evidence would not have been offered or admitted, but that does not in and of itself render the joint trial unfair.

We further note that on this record, there is little likelihood the jury convicted Batres based merely on his association with Parker and Bonner, rather than his individual guilt. (Cf. *Bryant*, *supra*, 60 Cal.4th at p. 383 ["To justify severance the characteristics or culpability of one or more defendants must be such that the jury will find the remaining defendants guilty simply because of their association with a reprehensible person, rather than assessing each defendant's individual guilt of the crimes at issue."].) The most damning evidence against Batres was the recording of his conversation with the jailhouse *Perkins* agent, in which Batres admitted to being present at Johnson's murder, handling one of the pistols used, and then cleaning and getting rid of it. In that conversation, Batres himself acknowledged the implausibility of claiming he did not know what Parker and Bonner intended, stating that if he made such a

23

claim, the police would ask, "[W]hy was y'all going on that side? What was the purpose of you guys even going around that area?" Given this evidence of guilt, we cannot find that the evidence pertaining to Parker's and Bonner's gang affiliation and other crimes rendered the joint trial grossly unfair.

Batres argues that when the prosecution presented Detective Mrakich with a "global hypothetical" linking all of Parker's and Bonner's crimes as gang-motivated, the prosecution effectively "link[ed] [Batres] to crimes he did not commit and show[ed] [Batres] was guilty by association. Again, we disagree. Batres identifies nowhere in the record in which the prosecution suggested he was involved in the other crimes. The evidence of the other crimes, as well as Mrakich's opinion as to the "global hypothetical," would have been admissible in a separate trial, as we have explained, to show the Johnson murder was not spontaneous and random but planned and gang-motivated.

Batres cites *People v. Chambers* (1964) 231 Cal.App.2d 23 (*Chambers*) as an example of prejudicial joinder, but that case is factually distinguishable and inapposite. In *Chambers,* the owner of a rest home and his supervising nurse were jointly charged with assaulting a patient. (*Id.* at pp. 24–25.) The action was consolidated with another action in which the supervising nurse was charged with three additional assaults against the same patient, and all four assault charges were tried together. (*Id.* at p. 25.) The jury convicted the owner of the one charge against him, and the nurse of the four charges against her. (*Ibid.*)

The Court of Appeal reversed the owner's conviction, concluding the owner "was probably convicted by association with [the nurse], in trial and otherwise, rather than by evidence of his

personal guilt." (*Chambers, supra*, 231 Cal.App.2d at p. 28.) The owner's guilt was established through the testimony of a single eyewitness, a nursing assistant, which the appellate court noted suffered from inconsistencies and possible bias, and was countered by testimony and documentary alibi evidence from the defendants. (*Id.* at p. 29.) Thus, "[c]onsidered in isolation, the thin evidence of [the owner's] guilt may well have failed to convince the jury." (*Ibid.*)

On the other hand, "[t]he record . . . was inflated by extensive evidence of [the nurse's] brutality, tending to fasten [the owner], as her employer, with moral responsibility for the acts of his employee." (*Chambers, supra*, 231 Cal.App.2d at p. 29.) Specifically, the prosecution introduced evidence of the nurse's attacks on and mistreatment of other patients over a period of six or seven years, with no evidence of "joint or conspiratorial action" involving the owner. (*Id.* at pp. 26–27.) The prosecution also inappropriately implied through cross-examination that the owner and nurse were lovers, "thus intensifying the notion of joint moral responsibility." (*Id.* at p. 29.) The appellate court rejected the notion that evidence of uncharged misconduct was admissible in this case to show intent or a common plan or scheme, when the owner's "intent was not in issue; nor were these separate and unconnected acts of violence asserted as separate manifestations of a common plan or scheme." (*Id.* at p. 30.)

*Chambers* is distinguishable from the instant case. In *Chambers*, the evidence of the nurse's assaults on patients had no bearing on the owner's guilt or innocence, apart from the single instance in which she and the owner were jointly charged. Thus, the evidence of the nurse's other assaults was irrelevant to the

25

charge against the owner, and served only to inflame the jury against him.

In the instant case, in contrast, evidence of Parker's and Bonner's other offenses was relevant to the charges against Batres, because, as discussed, that evidence tended to show the crime in which Batres participated was planned and gang-motivated. Unlike in *Chambers*, Batres's intent was an issue before the jury, and the evidence that the Johnson murder was part of a gang-motivated crime spree perpetrated by Parker and Johnson was relevant to Batres's intent. Also, as discussed, evidence of Parker's and Bonner's other crimes was relevant to the ballistic evidence found at the Johnson murder. Finally, unlike the inconsistent and potentially biased eyewitness in *Chambers*, Batres himself provided the greatest evidence of guilt in his recorded jailhouse statements, which militates against a conclusion that the jury found him guilty solely through his association with Parker and Bonner.

## B. Recent Amendments to the Penal Code Require Reversal of the Gang and Firearm Enhancements, But Not the Murder Conviction

Subsequent to Batres's trial and conviction, Assembly Bill No. 333 (2021–2022 Reg. Sess.) amended the Penal Code to change the elements to prove criminal street gang enhancements under section 186.22. (Stats. 2021, ch. 699, § 4.) That bill also added section 1109, which requires the trial court to try the gang enhancement separately from the underlying offense if the defendant so requests. (Stats. 2021, ch. 699, § 5.)

Batres argues all of these changes are retroactive and applicable to his judgment, which is not yet final. He contends that the changes to section 186.22 require reversal of his gang

26

and firearm enhancements, both of which depend on findings under section 186.22. He further asserts section 1109 requires reversal of his murder conviction, which the jury decided in the same trial as the gang enhancement allegations.

We agree, as does the Attorney General, that the gang and firearm enhancements must be reversed. We disagree section 1109 requires reversal of the murder conviction.

### 1. The gang and firearm enhancements must be reversed

Assembly Bill No. 333 made a number of changes to section 186.22, including narrowing the definition of "criminal street gang," altering the requirements to establish predicate offenses, and narrowing the definition of "what it means for an offense to have commonly benefitted a street gang." (*People v. Tran* (2022) 13 Cal.5th 1169, 1206 (*Tran*).) Because "[t]hese changes have the effect of 'increas[ing] the threshold for conviction of the section 186.22 offense and the imposition of the enhancement,' " our Supreme Court has deemed the changes ameliorative, and therefore retroactive " 'to all cases that are not yet final as of the legislation's effective date.' [Citation.]" (*Tran*, at pp. 1206–1207.)

Among the elements of the gang enhancement is that the underlying felony be committed "for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).) Assembly Bill No. 333 added a new subdivision (g) to the section stating, "As used in this chapter, to benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational. Examples

27

of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant."

At trial, the prosecution relied on the opinion of Detective Mrakich to establish the "benefit" of Parker's, Bonner's, and Batres's crimes to the Denver Lane Bloods. As the Attorney General concedes, in addressing the Johnson murder, the only benefit identified by Mrakich was reputational. Mrakich explained the benefit of the Johnson murder to the gang and gang members would be "reputation amongst each other, building a strong bond between individual gang members, showing their ruthless reputation, their willingness and eagerness . . . to go into a rival hood to execute somebody." He further stated, "[M]urder is the ultimate crime, and committing that crime, obviously, will skyrocket the reputation of that particular gang."

Because reputational benefit no longer is a valid basis to impose an enhancement under section 186.22, subdivision (b), we reverse the true finding on Batres's gang enhancement. We also reverse his firearm enhancement under section 12022.53, subdivision (e), which has as an element a violation of section 186.22, subdivision (b). (§ 12022.53, subd. (e)(1)(A); *People v. Lopez* (2021) 73 Cal.App.5th 327, 347–348 [reversal of true findings under § 186.22, subd. (b) requires reversal of true findings under § 12022.53, subd. (e)(1) as well].) On remand, the People may retry these allegations if the People so choose.[9]

---

[9] Should the People elect to retry the firearm enhancement, we express no opinion whether the People must prove again that a principal in the offense discharged a firearm

Batres argues his gang and firearm enhancements run afoul of additional provisions of the amended section 186.22, and also *People v. Valencia* (2021) 11 Cal.5th 818, which held that prosecutors cannot rely on hearsay to establish predicate offenses.  (*Id.* at p. 838.)  Given our holding, we decline to address these additional challenges.

Specific to the firearm enhancement, Batres further argues we should remand for resentencing because the trial court now has discretion under *People v. Tirado* (2022) 12 Cal.5th 688 to strike a firearm enhancement and impose a lesser uncharged firearm enhancement.  (*Id.* at p. 692.)  Batres also contends remand is necessary for the trial court to consider whether to impose a lesser term on the firearm enhancement under the guidance of the new subdivision (b)(6) of section 1170.  Our reversal of the firearm enhancement moots these arguments, and we express no opinion on them.

### 2.    Any error in failing to bifurcate under section 1109 was harmless

Batres contends under section 1109, he is entitled to be retried on his murder charge with the gang allegations decided in a subsequent, separate trial.  We conclude any error in failing to bifurcate the proceedings was harmless.

Section 1109, enacted under Assembly Bill No. 333, states, in relevant part, "If requested by the defense, a case in which a gang enhancement is charged under subdivision (b) or (d) of Section 186.22 shall be tried in separate phases as follows:  [¶]

_____

causing great bodily injury or death, or only that Batres violated section 186.22, subdivision (b).  The parties have not briefed that issue, and the trial court may address it in the first instance.

(1) The question of the defendant's guilt of the underlying offense shall be first determined. [¶] (2) If the defendant is found guilty of the underlying offense and there is an allegation of an enhancement under subdivision (b) or (d) of Section 186.22, there shall be further proceedings to the trier of fact on the question of the truth of the enhancement." (§ 1109, subd. (a).)

In enacting section 1109, the Legislature expressed concern that "[g]ang enhancement evidence can be unreliable and prejudicial to a jury," and "that allowing a jury to hear the kind of evidence that supports a gang enhancement before it has decided whether the defendant is guilty or not may lead to wrongful convictions." (Stats. 2021, ch. 699, § 2, subds. (d)(6), (e).) The Legislature declared that "[b]ifurcation of trials where gang evidence is alleged can help reduce its harmful and prejudicial impact." (*Id.*, subd. (f).)

The Courts of Appeal are divided as to whether section 1109 is retroactive. (Compare, e.g., *People v. Burgos* (2022) 77 Cal.App.5th 550, 554 [§ 1109 is retroactive], review granted July 13, 2022, S274743, with *People v. Ramirez* (2022) 79 Cal.App.5th 48, 53 [§ 1109 is not retroactive], review granted Aug. 17, 2022, S275341.) The issue currently is pending before the Supreme Court.

We need not decide whether section 1109 is retroactive, however, because assuming arguendo it is, we conclude any error in failing to bifurcate the proceedings was harmless. (See *Tran*, *supra*, 13 Cal.5th at p. 1208 [declining to decide § 1109's retroactivity because failure to bifurcate was harmless]).

As an initial matter, we must determine the proper test to apply when assessing the assumed error in this case. Our Supreme Court has held that error under section 1109 is subject

to the test for state-law harmless error under *People v. Watson* (1956) 46 Cal.2d 818, unless the error rendered the trial " 'fundamentally unfair,' " in which case we apply the stricter harmless error standard under *Chapman v. California* (1967) 386 U.S. 18. (*Tran, supra*, 13 Cal.5th at p. 1209, italics omitted.)

Batres argues we should apply the *Chapman* standard "because the Legislature's intent in enacting . . . section 1109 was to promote fairness to the accused, so its contravention will implicate[ ] the due process clause of the Fourteenth Amendment." In making this argument, which is based on the Legislature's intent in enacting section 1109 as opposed to the particular circumstances of his case, Batres seeks to apply the *Chapman* standard to any violation of section 1109. This argument necessarily fails, because our Supreme Court in *Tran* made clear the *Watson* standard applies absent a case-specific showing of fundamental unfairness. (See *Tran, supra*, 13 Cal.5th at p. 1209 [finding constitutional prejudice "did not occur in this case," and applying the *Watson* standard].) Because Batres makes no argument that under the particular circumstances of his case, the failure to bifurcate rendered his trial fundamentally unfair, we apply the *Watson* standard, under which we will uphold the judgment unless it is reasonably likely that exclusion of the gang evidence would change the jury's verdict on the murder charge. (*Tran*, at p. 1209.)

We conclude it is not reasonably likely that bifurcation would have changed the jury's verdict. Much of the evidence in support of the gang enhancement also was relevant to prove Batres's murder charge, and would have been admissible for that purpose even in a bifurcated trial. (See *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1132 ["nothing in Assembly Bill 333 limits

the introduction of gang evidence in a bifurcated proceeding where the gang evidence is relevant to the underlying charges"]; *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049–1050 (*Hernandez*) ["To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary."].)

For example, the evidence that Parker, Bonner, and Batres were active members of allied gangs, that those gangs were rivals of the Hoover Criminals, that the rivalry historically manifested in acts of violence between the rival gangs, that Parker and Bonner had engaged in such acts of violence numerous times in the months and days prior to the Johnson killing, and that Johnson himself was affiliated with the Hoover Criminals, tended to show the perpetrators' motive and intent, and weighed against an inference that the murder of Johnson was anything other than an orchestrated gang shooting. (*Hernandez*, *supra*, 33 Cal.4th at p. 1049 ["Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime."].)

Batres points out that in a bifurcated proceeding, the jury deciding Batres's guilt on the murder charge would not hear evidence specific to the gang enhancement, such as the expert's opinion as to the primary criminal activities of the Denver Lane Bloods and the predicate offenses committed by Tarver and Smith. None of this evidence was particularly prejudicial. The violent and criminal nature of Denver Lane Bloods members was

illustrated more dramatically by the evidence of Parker's and Bonner's own actions, which as discussed would have been admissible in a bifurcated trial, than in Mrakich's generic listing of gang crimes, or the brief mention of robberies committed by Tarver and Smith.

Batres further argues that in a bifurcated proceeding "the gang expert's responses to hypothetical questions would be very different in scope since the issues of whether the shooting was for the benefit of, at the direction of or was in association with [the Denver Lane Bloods] would not be before the jury." Given the need to prove, however, that Batres knowingly engaged in a planned attack with fellow gang members, the prosecution in the murder trial would still seek to establish through hypotheticals that when multiple gang members drive together into rival territory, they likely are working together to commit gang-motivated crimes. Thus, whatever damage Batres suffered from the expert's assessment of the hypotheticals would exist even in a bifurcated trial.

Finally, we note again that the strongest evidence of Batres's guilt were his own statements to the *Perkins* agent, putting him at the scene of the murder in a vehicle with the two shooters, and admitting he handled, cleaned, and disposed of one of the weapons used. Even assuming some of the gang evidence would have been excluded from the guilt phase in a bifurcated trial, it is not reasonably likely the jury would have reached a different verdict given the jailhouse statements in combination with the other evidence we have discussed that would be admissible even in a bifurcated proceeding.

## C. Changes to the Penal Code Require Resentencing on the Firearm Possession Count

Subsequent to Batres's trial and conviction, the Legislature amended Penal Code section 1170 to add subdivision (b)(2), which prohibits the trial court from imposing the upper term on an offense based on circumstances in aggravation unless "the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (Stats. 2021, ch. 731, § 1.3.)

The parties agree section 1170, subdivision (b)(2) is retroactive to nonfinal judgments like Batres's. (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1039 [amendments to § 1170, subd. (b) are retroactive].) The parties further agree, as do we, that the trial court sentenced Batres to the high term on the firearm possession count based on circumstances in aggravation the jury did not find true beyond a reasonable doubt and to which Batres did not stipulate. Accordingly, Batres must be resentenced on the firearm possession count in accordance with section 1170, subdivision (b)(2).

Also subsequent to Batres's trial and conviction, the Legislature added another subdivision to section 1170, now codified as subdivision (b)(6). This subdivision requires the trial court to impose the lower term if certain circumstances apply, unless imposition of the lower term would be contrary to the interests of justice. The circumstances mandating imposition of the lower term include, inter alia, that the defendant "has experienced psychological, physical, or childhood trauma," or the defendant was a youth when the offense was committed. (§ 1170, subd. (b)(6)(A), (B).) We agree with Batres that during

34

resentencing the trial court should consider the factors under section 1170, subdivision (b)(6) to the extent they are applicable.

## DISPOSITION

The true findings and enhancements on count 10 under Penal Code sections 186.22 and 12022.53 are reversed. The sentence is vacated on all counts. The judgment otherwise is affirmed.

The matter is remanded to the trial court with directions to allow the People to retry defendant on the allegations under Penal Code sections 186.22, subdivision (b)(1) and 12022.53, subdivision (e) on count 10. Following retrial, or if the People elect not to proceed with retrial, the trial court shall resentence defendant, consistent with this opinion, and send a new abstract of judgment to the Department of Corrections and Rehabilitation.

<u>NOT TO BE PUBLISHED.</u>

BENDIX, J.

We concur:

ROTHSCHILD, P. J.

WEINGART, J.

35